# SOUTHERN PACIFIC COMPANY v. INTERSTATE COMMERCE COMMISSION.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 527.   Argued December 13, 1910.—Decided February 20, 1911.

An order of the Interstate Commerce Commission, made in consequence of assumption of powers not possessed by it, is void, and its enforcement should be restrained by the courts.

The powers of the Interstate Commerce Commission do not extend to regulating and controlling the policy of the owners of railroads in fixing rates, and it cannot substitute for a just and reasonable rate, a lower rate, either on the ground of policy or on the ground that the railroad was by its former conduct estopped from charging a reasonable rate.

Where the shippers do not complain of a new and higher rate because it is intrinsically an unreasonable one, but because, although reasonable, the railroads are estopped to advance it on account of having maintained the lower rate for a considerable period, it is beyond the power of the Commission to direct a restoration of the old rate; and so *held* in regard to the Willamette Valley lumber rates.

Where the Commission makes an order restoring a rate that shows on its face it was made on the ground that the railroad was estopped to increase it, the order will not be presumed to have been made for the purpose of establishing a reasonable rate, if it excludes a section from the benefit of the restored rate which amounts to a discrimination against that section.

Questions arising on the validity of an order of the Interstate Commerce Commission fixing a rate do not become moot merely because the period for which the rate is prescribed has expired, where an element of liability for reparation remains.   See *Southern Pacific Terminal Company* v. *Interstate Commerce Commission, post,* p. 498.

THE facts, which involve the validity of an order of the Interstate Commerce Commission in regard to appellants' rates on lumber, are stated in the opinion.

*Mr. Maxwell Evarts*, with whom *Mr. F. C. Dillard* was on the brief, for appellants.

*Mr. Wade H. Ellis* and *Mr. Luther M. Walter* for the Interstate Commerce Commission, appellee:

The railroads complain of the order first because the Commission was without authority to fix any rates whatever; second, because the Commission did not establish the new rates because the low rate was unreasonable or because the new rates were reasonable, but simply because the railroads had promised and long maintained a lower rate; and because the rates established by the Commission are asserted by the railroads to be unreasonably low, unremunerative, and even below the cost of service.

Congress itself may fix interstate railroad rates. *Gibbons* v. *Ogden*, 9 Wheat. 1. It is expressly asserted in many cases. *Wabash &c. R. R. Co.* v. *Illinois*, 118 U. S. 557; *Phila. S. S. Co.* v. *Pennsylvania*, 122 U. S. 326; *Northern Securities Case*, 193 U. S. 197, 368.

Fixing of rates is a regulation of interstate commerce. *Maximum Rate Cases*, 167 U. S. 479; *C., N. O. & T. P.* v. *Int. Comm. Comm.*, 162 U. S. 184, 197; *Smyth* v. *Ames*, 169 U. S. 466; *Wabash R. R. Co.* v. *Illinois*, 118 U. S. 557.

Congress may confer upon a commission power to ascertain what rate as a maximum will be just and reasonable and prescribe and enforce that rate. *Missouri River Rate Cases*, 218 U. S. 88; *Int. Comm. Comm.* v. *C., R. I. & P. Ry. Co.*, 218 U. S. 88; *Int. Comm. Comm.* v. *C., B. & Q. Ry. Co.*, 218 U. S. 113; *Int. Comm. Comm.* v. *Stickney*, 215 U. S. 98; *Int. Comm. Comm.* v. *C., N. O. & T. P. Ry. Co.*, 167 U. S. 479, 494.

The power thus exercised by the Commission does not constitute the usurpation of legislative or judicial functions, or unite in one body conflicting governmental authority, but consists merely in the ascertainment of facts upon which operates the general rule of Congress prescribing just and reasonable rates. *St. L. &c. Ry. Co.* v. *Taylor*, 210 U. S. 281; *Railroad Commission Cases,* 116 U. S. 307; *Reagan* v. *Farmers' L. & T Co.*, 154 U. S. 362; *Field* v. *Clark*, 143 U. S. 693; *Buttfield* v. *Stranahan*, 192 U. S. 470; *Union Bridge Co.* v. *United States*, 204 U. S. 364.

Penalties imposed by the Interstate Commerce Act do not amount to a deprivation of property because, first, no penalties are sought to be recovered in this case, and, second, the penalty provision is separable from the remainder of the statute. *Commodities Clause Cases*, 213 U. S. 366, 417.

The real gist of the railroads' complaint is that the Commission heard testimony as to the circumstances under which the old rate of $3.10 had been established and maintained and, after being once increased and again restored, was finally supplanted by the new $5 rate which the shippers made the subject of their appeal for relief.

The only point pressed by appellants is that the Commission gave a wrong reason for its action, but no expressions in the opinion of the Commission can be used to defeat its order if the order is otherwise lawful. *So. Pac. Co.* v. *Int. Comm. Comm.*, 200 U. S. 536, 556, 557.

The Interstate Commerce Commission is not a court. It is not governed by technical rules of law with respect to the admission of evidence. *Int. Comm. Comm.* v. *Baird*, 194 U. S. 25, 44; § 13 of the Interstate Commerce Act as amended.

The chief function of the court, is to consider not the method by which the result was reached, but whether or not the rate prescribed is so low as to contravene the con-

stitutional provisions for the protection of property. *San Diego Land Co.* v. *National City*, 174 U. S. 739; *Knoxville* v. *Water Co.*, 212 U. S. 1; *Prentis* v. *Atl. Coast Line Co.*, 211 U. S. 210; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19.

The Commission had a right, in determining the reasonableness of rates involved, to consider the effect of the advance by the railroads from $3.10 to $5 per ton upon the transportation of lumber.

The record in this case shows conclusively that the advance in rates made by the railroads in 1907 from $3.10 to $5 per ton for the transportation of the class of lumber involved, would, if permitted to stand, simply stop such transportation altogether.

It follows that the $5 rate, being absolutely prohibitive of any traffic, amounts to a withdrawal of transportation facilities. *Atl. Coast Line R. R. Co.* v. *No. Car. Corp. Comm.*, 206 U. S. 1.

In determining what was a reasonable rate, the Commission was right in considering, as an item of evidence, the fact that the railroads had voluntarily established and long maintained a rate of $3.10 for the service. *Frye* v. *Nor. Pac. Ry. Co.*, 13 I. C. C. Rep. 501, 507, 508; *Holmes* v. *So. Ry. Co.*, 8 I. C. C. Rep. 561, 568; *Stockyards* v. *Keith*, 139 U. S. 128; *Int. Comm. Comm.* v. *Chicago &c. R. R. Co.*, 186 U. S. 320.

The Commission heard testimony on the reasonableness of the rates and did not limit the basis of its order to the past conduct of the railroads, but, independently of any so-called estoppel, expressly found the $5 rate to be unreasonable and the rates prescribed to be reasonable.

The railroads having attacked the lawfulness of the rates prescribed by the Commission, the burden was upon them to show that the rates so fixed were below the cost of service or so unreasonably low as to amount to a confiscation of property. They introduced no testimony whatever, either before the Commission or the court be-

low, which proves or tends to prove the allegation in their bill of complaint.

The real issue in this case is whether or not the rates fixed by the Commission are so low as to constitute a deprivation of property. *Land Co.* v. *National City,* 174 U. S. 739; *Willcox* v. *Gas Co.,* 212 U. S. 19.

If the rate prescribed is not for a distinct and separable service and if it appears that notwithstanding such a rate the road is enabled to earn a fair return upon all its business, the rate so prescribed will not be condemned as a deprivation of property. *Minn. & St. L. R. R. Co.* v. *Minnesota,* 186 U. S. 257; *Atl. Coast Line R. R. Co.* v. *No. Car. Corp. Comm.,* 206 U. S. 1; *St. L. & S. F. R. R. Co.* v. *Gill,* 156 U. S. 649.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Whether the court below was right in refusing to enjoin at the suit of the railway companies who are appellants the enforcement of an order of the Interstate Commerce Commission is the general subject for consideration on this record.

When that which is superfluous is put out of view, it will come to pass that every substantial controversy which the case presents will be disposed of by determining what was the character of the order made by the Commission; that is to say, what was the power which that body exerted in making the order in question. We state at once the pertinent facts.

The Willamette Valley, about 150 miles long, lies in the western part of the State of Oregon, south of the Columbia River, and through it there flows in a northerly direction the Willamette River, which empties into the Columbia River. Portland is on the Willamette River at or near where that river empties into the Columbia River. From

Cornwallis, on the Willamette River, a point about 97 miles south of Portland, that is, about that distance from where the Willamette empties into the Columbia, the Willamette is navigable, and there is navigation from Portland to the sea by means of the Willamette and the Columbia Rivers. The rails of the Oregon and California Railroad from Portland pass through the Willamette Valley, paralleling the Willamette River at various distances, and extend to the Oregon and California state line, where that road connects with the Southern Pacific Company. The latter has for a number of years operated the Oregon and California as part of its system.

In November, 1907, a complaint was filed with the Interstate Commerce Commission on behalf of the Western Oregon Lumber Manufacturers' Association and others, concerning a rate of $5 per ton, in carload lots, on "green common rough fir lath and lumber and forest products" from Willamette Valley points to San Francisco and bay points, fixed in a tariff filed by the Southern Pacific Company with the Commission and which became operative in April, 1907. It was charged that the rate complained of was unreasonable in and of itself and discriminatory. It was averred that from about 1898 there had existed a rate of $3.10 for carrying the same character of lumber between the points named; that upon the faith of this rate and the belief that it would not be changed large amounts of capital had been invested in lumber mills in the Willamette Valley; that the people in that valley were dependent upon the lumber industry, and that such industry would be destroyed and the population be detrimentally affected if the new rate of $5 per ton was continued to be charged. It was alleged that the $3.10 rate was reasonable in and of itself, and that the rate had been increased without just cause upon the theory that the lumber interest in the Willamette Valley was prosperous, and that hence the traffic could stand the increase. The

railroad companies answered, setting up the reasonableness of the $5 rate. They in effect averred that the $3.10 rate, which had previously prevailed, was unreasonably low and that it had been fixed solely for the purpose of enabling lumber from the Willamette Valley to reach a market in San Francisco and bay points, which it could not have done if a just and reasonable rate had been exacted. This condition, it was alleged, had arisen from the fact that from Portland and other points on the Columbia River and Puget Sound there was a highly developed lumber industry accessible to San Francisco and bay points by water at rates so low as to have absolutely excluded the shipping of any lumber from the Willamette Valley by rail to such points, unless a very low rate had been fixed by the railroad companies to meet the water-borne lumber traffic, and that there was no market which was commercially available for the Willamette Valley lumber other than that of San Francisco and bay points when the $3.10 rate was fixed. The complaint and the answer which we thus state are not in the record, but we have summarized their contents from a statement made concerning the same by the Interstate Commerce Commission in its answer in this suit filed in the Circuit Court.

It is certain that for a number of years the $3.10 rate was applied both to shipments of lumber not only from the Willamette Valley, but also from Portland. Several years, however, before the going into effect of the $5 rate fixed in the tariff of April, 1907, a tariff fixing that rate had been made applicable to Portland. During the hearing before the Commission the Portland lumber interests intervened and asked that if the $3.10 rate was restored to Willamette Valley it should also be restored to Portland, so as to prevent discrimination against Portland.

After a hearing the Commission in June, 1908, filed its report and made an order adverse to the railway companies, Commissioners Knapp and Harlan dissenting. 14

I. C. C. Rep. 61. It suffices to say that the order entered directed the railroad to cease from charging the $5 rate complained of from Willamette Valley points and fixed as a proper rate from certain points in the valley the sum of., $3.40 a ton, and from the remaining points in the valley the sum of $3.65. Although some of the points embraced by the order were within a few miles of Portland that city was not given the benefit of the reduction, and therefore remained subject to the $5 rate.

The railroad companies, refusing to yield obedience to the order, commenced this suit in equity in the Circuit Court of the United States for the Northern District of California to have the order set aside and to enjoin its enforcement. After a demurrer was sustained, an amended bill was filed. By this bill it was averred that the rate of $5 fixed by the tariff which the Commission had set aside was a just and reasonable rate *per se*, and that the rate fixed by the Commission was so unreasonably low as to be unjust and unreasonable. This was alleged to be the case not only in view of the great increase in the cost of the operation of the road since the time when the $3.10 rate was put in force, but also because of the normally excessive cost of maintenance and operation resulting from the mountainous country which the road traversed, subjecting to an unusual expense for repairing damage done by floods and freshets, the high grades requiring the application of increased motive power, and permitting even with such power the movement of only unusually short trains, thereby causing a much greater average expense. Referring to the rate of $3.10 which had previously prevailed, the circumstances connected with its establishment were detailed. It was alleged that the rate was unreasonably low when fixed and was so fixed by the railroad solely with the object of encouraging the lumber industry in the Willamette Valley and to enable it to reach a market, a result which otherwise could not have been attained.

The averments on this subject reiterated the statements made in the answer before the Commission. It was alleged that having maintained the unreasonably low rate for the reasons stated the railroad companies had finally changed the same and fixed a just and reasonable rate for the services rendered, because of changes in the situation of the lumber interest in the Willamette Valley. Those changes it was said arose from the opening of markets for lumber from the Willamette Valley by means of new railroad routes via Portland as a gateway to the East, by means of which a large percentage of lumber produced in the Willamette Valley was moved to other markets. It was alleged that the Commission, in setting aside the increased tariff rate of $5 and fixing substantially the old rate, had exceeded the powers conferred upon it by law, because it did not act in the exercise of the authority conferred upon it to determine whether a rate was just and reasonable in and of itself with regard to the service rendered, but had proceeded upon the assumption that power was conferred upon it to fix an unreasonable rate because of its belief as to the equities of the situation or upon the basis of principles of estoppel or upon its conception of public policy and its right to enforce what was deemed best, under the circumstances, for the interest of shippers.

There was a demurrer to the amended bill, and the court certified the case to this court. The certificate was dismissed. 215 U. S. 226. On the receipt of the mandate the demurrer was withdrawn and a new demurrer, as also an answer to the bill, were filed. In the answer the lumber conditions in the Willamette Valley were recited, as also what were alleged to be the circumstances connected with the establishment of the $3.10 rate and the proceedings had before the Commission in the controversy referred to, were detailed. The regularity of the proceedings before the Commission was averred, and the legality and finality of the findings and conclusions of that body were asserted.

It was declared that the rates fixed from the points in the Willamette Valley, excluding Portland, were just and reasonable in and of themselves. Traversing the allegations of the complaint, it was averred that the Commission found the $5 rate to be unreasonable and unjust, admitted that it found the $3.10 rate to be a low rate, but denied that it found such rate to be unreasonably low, and denied that the $3.40 and $3.65 rates were substantially the same as the $3.10 rate.

The cause was heard upon the amended bill, the answer, the replication of the plaintiff and the evidence introduced before the Commission. The Circuit Court, as we have said, entered a decree dismissing the bill. This was done upon the theory that, as the Commission found that the rate fixed by it gave some remuneration above the cost of operation, and was not therefore confiscatory, there was no power to interfere. This appeal was then taken.

In the argument at bar the railroad companies do not question that if a complaint is made to the Interstate Commerce Commission concerning the unreasonableness of a rate that body has the authority to examine the subject, and if it finds the rate complained of is in and of itself unreasonable, having regard to the service rendered, to order the desisting from charging such rate, and to fix a new and reasonable rate, to be operative for a period of two years. The companies further do not deny that where the Commission exercises such authority, its finding is not subject to be reviewed by the courts. *Interstate Commerce Commission* v. *Illinois Central R. R. Co.*, 215 U. S. 452. In other words, the argument on behalf of the railroads fully concedes that an order of the Commission is not open to attack in the courts so long as that body has kept within the powers conferred by the statute. Making these concessions, the proposition relied upon to secure reversal is that the court below should have set aside the order of the Commission because that order was in excess of the

power conferred upon the Commission, and this, it is insisted, is to be determined by substance, and not mere form.   In other words, the contention is, that although the order made by the Commission may have been couched in a form which would cause it, superficially considered, to appear to be but the exercise of an authority to correct an unreasonable rate, yet if it plainly results from the record that the order of the Commission was not the exercise of such an authority, but was based upon the assumption by that body of the possession of a power not conferred by law, the mere form given by the Commission to its action does not relieve the courts from the duty of reviewing and correcting an abuse of power.   Applying these propositions, the insistence is that both in form and in substance the order of the Commission is void, because it manifests that that body did not merely exert the power conferred by law to correct an unjust and unreasonable rate, but that it made the order which is complained of upon the theory that the power was possessed to set aside a just and reasonable rate lawfully fixed by a railroad whenever the Commission deemed that it would be equitable to shippers in a particular district to put in force a reduced rate. That is to say, the contention is that the order entered by the Commission shows on its face that that body assumed that it had power not merely to prevent the charging of unjust and unreasonable rates, but also to regulate and control the general policy of the owners of railroads as to fixing rates, and consequently that there was authority to substitute for a just and reasonable rate one which in and of itself in a legal sense might be unjust and unreasonable, if the Commission was satisfied that it was a wise policy to do so or because a railroad had so conducted itself as to be estopped in the future from being entitled to receive a just and reasonable compensation for the service rendered.   On the other hand, the Commission in the argument at bar does not contend that it possessed the indeed

abnormal and extraordinary power which the railroads thus say was exerted in rendering the order complained of, a power which if it obtained would open a vast field for the exercise of discretion, to the destruction of rights of private property in railroads, and would in effect assert public ownership without any of the responsibilities which ownership would imply. While it is not denied on behalf of the Commission that that body may have considered the prior rate prevailing in the Willamette Valley, the period during which it had been in force, and the effect upon the business situation in the valley of a change to a higher charge, all these things it is insisted were not made the basis of the power exerted, but were simply taken into consideration as some of the elements proper to be considered in the ultimate exertion of the lawful power to forbid an unjust and unreasonable rate and fix a reasonable one.

It is clear, therefore, as we have said at the outset, that the result of the contentions and concessions of the respective parties is to reduce the controversy to a single issue, which is, What was the nature and character of the order made by the Commission? That is, What, in substance, was the power which the Commission exerted in making the order?

Coming to the consideration of that subject, we are of opinion that the court below erred in not restraining the enforcement of the order complained of, because we see no escape from the conclusion that the order was void because it was made in consequence of the assumption by the Commission that it possessed the extreme powers which the railroad companies insist the order plainly manifests. We proceed very briefly to state the reasons which compel us to this conclusion. In the first place, when the complaint which was made to the Commission and the answer of the railroad companies to that complaint are considered they give rise to the inference that in substance

the subject complained of was not the intrinsic unreasonableness of the new rate which the railroad companies substituted for the former rate, but the injury it was thought would be suffered from not continuing the old rate in force, an injury arising from circumstances extrinsic to the new rate; that is, a loss which would be suffered by substituting the higher rate, even if that rate was in and of itself reasonable and just. That such was the view entertained by the complainants when the hearing began before the Commission is too clear to require anything but statement. Thus during the opening made on behalf of the complainants by their counsel, Mr. Teal, after he had made statements concerning the origin of the $3.10 rate, the following took place:

"Commissioner COCKRELL: How much was that; $3.10 a ton?

"Mr. TEAL: $3.10 a ton; yes, 15½ cents a hundred; and I will state that we do not claim that that is not a low rate. It is a low rate. In fact, I may say that it is one of the lowest rates on lumber in the United States, and it is a rate put in, as I state, maintained for the purposes I state, and the railroad company is entitled to full credit for having done it.

"Commissioner PROUTY: Let me ask you, Mr. Teal, this question. Suppose that rate had never been lower than 25 cents a hundred pounds, which is $5 a ton, would you claim that this Commission today ought to reduce that rate?

"Mr. TEAL: No; I don't think I would.

"Commissioner PROUTY: That is to say, you do not claim the rate is unreasonable in itself?

"Mr. TEAL: No; I do not.

"Commissioner PROUTY: You put your case entirely on the ground that these people represented to your clients and to other mill men in the Willamette Valley that they would establish this lower rate for the purpose of building up the industry in that valley, and that the industry can-

not exist there in competition with other sections unless that rate is maintained in effect?

"Mr. TEAL: Yes, sir.

"Commissioner PROUTY: And therefore the railroad is obliged to maintain it in effect?

"Mr. TEAL: It has been maintained for eight or nine years. You have my position exactly, Mr. Commissioner.

"Commissioner PROUTY: That simply shows that it has been maintained and industries have grown up; that the railroad company has, during that period, elected to maintain it, and found it profitable, probably?

"Mr. TEAL: You have stated my position exactly. I am not here complaining about the rates being high or low, because it is a low rate."

Thereafter, as Mr. Teal concluded his opening statement, the following occurred:

"Commissioner PROUTY: That seems to be your case, Mr. Teal. If they can, there is no reason from your statement why the rates should be reduced, because you say the rate is low enough, unless those men have been induced to build their mills there, and ought to be protected.

"Mr. TEAL: That is correct. I want you to understand, Mr. Commissioner, that I do not claim the Commission has a right to compel the railroad, under ordinary circumstances, to meet water rates or any other competition."

It is true that subsequently, when counsel for the railroad companies was about to make his opening statement, Mr. Teal, after reiterating "that the $3.10 rate is a low rate," observed: "I do not say it should necessarily pay a $5 rate. That is, I do not want to be understood as saying that this rate of five dollars, in and of itself, would be reasonable." Answering the query of one of the commissioners as to whether, if the railroads had maintained in effect for the last ten years "this rate of 25 cents a hundred pounds," it would be claimed "that that was so unreasonable that the Commission ought to reduce it," Mr.

Teal answered: "Yes; I would claim that that would not be a reasonable rate to all these points." These remarks, however, can properly only be regarded as a declaration of an unwillingness to concede more than that the $3.10 rate was a low rate, and the attempt to engraft a qualification or limitation upon the prior declarations of counsel cannot be treated as having any efficacy, since no proof whatever bearing upon an issue as to the reasonableness of the $5 rate for the service to be rendered was introduced by the complainants. In fact, no attempt was even made to cross-examine Mr. Miller, the general traffic manager of the defendant, who testified on that subject. That the complainants intended to confine their evidence to the issue of whether the $3.10 rate should be maintained in order to enable the lumber mills to continue to prosper is evidenced by the following:

"Commissioner PROUTY: . . . Mr. Teal, there does not seem to be much dispute about the questions in this case. The mills have a rate to the South, and one question is to what extent they are dependent upon that rate for their continued existence. They have a rate to the East. For what reason is not that rate as valuable to them as it is to Portland and other mills, and to what extent is it necessary that this rate should be maintained to San Francisco in order to fairly continue the prosperity of these establishments?

"Mr. TEAL: That is where I intend to confine my testimony."

The order of the Commission, as we have said, applied the rate which it fixed substantially to the very doors of Portland, but did not make the reduction applicable to that city. While we shall have occasion in a moment to refer to this aspect of the order as conclusively showing on its face that the power exerted in making it was not the power to condemn an unreasonable and fix a reasonable rate, an excerpt from the examination by Mr. Cotton for

the railroad companies and Mr. Abel for the intervenors, of two witnesses—J. Poulsen for the Portland interests and Dixon for the Willamette Valley interests—will make perfectly clear how really immaterial the question of the reasonableness of the $5 rate was considered to be.

On cross-examination of Mr. Poulsen the following transpired:

"Mr. COTTON: In saying that you think Portland ought to have a lower rate, do you mean they should have a lower rate than a $3.10 rate?

"Mr. POULSEN: I mean they should have a lower rate than the inland people on account of having water competition.

"Mr. COTTON: But you do not express your opinion about the reasonableness of the rate?

"Mr. POULSEN: No, sir.

"Mr. ABEL: He was not asked that.

"Mr. COTTON: That is what I understood, but I just wanted to make it clear.

"Mr. POULSEN: No."

On the examination of Mr. Dixon the following ensued:

"Mr. COTTON: It would follow, as a matter of fact, that if the $3.10 rate, or any lower rate than the barge rate was established, that it ought to be extended all the way up to Portland; would it not?

"Mr. DIXON: Personally I have no objection to that; but I do not see that it would necessarily follow.

"Mr. COTTON: I am not considering your standpoint. I merely want your best opinion with reference to the industry in western Oregon.

"Mr. DIXON: I think, Mr. Cotton, that the arrangement in effect prior to April 18th was, from the standpoint of the lumber shippers, a fair arrangement.

"Commissioner PROUTY: How can you justify leaving Portland out of the San Francisco rate and taking you into the Eastern rate?

"Mr. DIXON: The Portland mills have so much the ad-

vantage of us in almost every other branch of the business that I do not see how it is unfair to them to give us what might appear to be a slight advantage in one particular. In other words, they have a better grade of logs, they have a better market and more markets, they have a place to dispose of their refuse, and, what counts for more than anything else and is absolutely necessary to the successful conduct of the lumber business, they can get rid of their output, while we cannot, up to date."

Although we find the record replete with statements made during the course of the hearing by counsel for both parties, and certainly by one or more of the commissioners who were present at the hearing, which we think leave no doubt as to the nature and character of the power exerted, we do not pursue the subject further, since we are of opinion that the face of the opinion and the order so additionally serve to make manifest the situation as to render it unnecessary to do more than briefly advert to those subjects. While it is true that the opinion of the Commission may contain some sentences which, when segregated from their context, may give some support to the contention that the order was based upon a consideration merely of the intrinsic unreasonableness of the rate which was condemned, we think when the opinion is considered as a whole in the light of the condition of the record to which we have referred it clearly results that it was based upon the belief by the Commission that it had the right under the law to protect the lumber interests of the Willamette Valley from the consequences which it was deemed would arise from a change of the rate, even if that change was from an unreasonably low rate which had prevailed for some time to a just and reasonable charge for the service rendered for the future. Manifestly, this was deemed by the Commission to be the power which was being exerted, since Mr. Commissioner Harlan, joined by the Chairman of the Commission, dissented on the ground that the order

was an exertion of a power not possessed to give effect to a supposed equitable estoppel, and no language was inserted in the opinion to indicate to the contrary. The obvious impression as to the nature and character of the power exerted given by the very face of the opinion of the Commission is shown by the syllabi to the official report of the opinion, which we copy in the margin.[1]

Finally, the express exclusion of Portland from the benefit of the reduced rate and the reasons given for the exclusion indubitably establish the character of the power exerted so as to exclude the possibility of holding that it was merely the exercise of the right to correct an unjust and unreasonable rate. We say this because if the assumption be indulged in that the order was but the manifestation of the authority to correct an unreasonable rate, the traffic of Portland, in the absence of some lawful reason for excluding it, would be discriminated against by the order excluding Portland from the benefit of the reduced rate. We cannot, therefore, assume that the order was legal because it rests upon the power to correct an unreasonable and to substitute a reasonable rate, since to indulge in that assumption would at once beget the inevitable inference that the order was repugnant to the statute because of its dis-

[1] 1. Where a rate has been established and maintained for a considerable period for the purpose of developing a particular industry and with full knowledge that the industry could not be developed without it, and where, under the influence of such rate, large amounts of money have been invested in property the value of which must be seriously impaired by an advance of the rate, that fact is an important consideration in passing upon the reasonableness of such advance.

2. The Southern Pacific Company established a rate of $3.10 per ton upon rough green fir lumber and lath from points in the Willamette Valley to San Francisco for the purpose of developing the lumber industry in that section, and maintained the rate in effect, with a brief interval, for six years; and on the strength of this rate that industry attained considerable proportions. In April, 1907, this rate was advanced to $5 per ton: *Held*, That the advance was unreasonable and that the rate ought not for the future to exceed $3.40 per ton.

criminatory character. And the reasons given for the exclusion of Portland from the benefit of the reduction which the order made likewise leave no room for the conclusion that the reduction was based merely upon the finding that the tariff rate which was reduced was, considering the service rendered, in and of itself unreasonable. The reasons for not applying the reduced rate to Portland were thus explained in the report of the Commission:

"The considerations which induce us to apply this lower rate to mills in the Willamette Valley do not obtain in case of Portland. These manufacturers have the benefit of the water rate, and are not, therefore, dependent at all upon the defendants for reaching the San Francisco market. The low rate was only applied to Portland for a comparatively short time, and has not been in force there for the last four years. It is of no special importance to the manufacturer at that point, and no injustice is done by withdrawing it. The distance from Portland is considerably greater than the average distance from Willamette Valley mills, and, on the whole, we think the defendants should be left to their option in meeting or declining to meet water rates at Portland. The claim of the intervenors is therefore denied."

Treating the order as having been based upon the assumed possession of the extraordinary power which it is insisted was exercised in making the order, the force of the reasoning thus advanced to sustain the order cannot be successfully gainsaid. But upon the theory that the order was made merely as the result of the exercise of the statutory power to prevent the charging of an unreasonable and unjust rate, having regard to the service rendered, the inconsequence of the reasoning stated becomes at once patent. This must be the case because Portland had been deprived by the railroads of a just and reasonable rate for a longer time than the Willamette Valley points certainly afforded no ground for concluding that Portland was not

entitled to relief, and it is equally certain that the fact that there was competition by water from Portland can in no way justify the permitting the railroads to continue to charge against traffic from Portland a high and unreasonable rate. Indeed, if the order be assumed to have been made merely as the result of the power to correct an unjust and unreasonable rate, then the reasoning by which the order, in so far as it dealt with Portland was concerned, was sustained, comes to this, that the greater the wrong the lesser the right to redress, and the greater the reason for the low and competitive rate the stronger the reason for refusing to fix such a rate.

The considerations just stated dispose of the entire controversy except in one particular. It is claimed at bar that the questions arising for decision are moot, since in consequence of the lapse of more than two years since the order of the Commission became effective, by operation of law the order of the Commission has spent its force, and therefore the question for decision is moot. The contention is disposed of by *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission,* this day decided, *post,* p. 498. In addition to the considerations expressed in that case it is to be observed that clearly the suggestion is without merit, in view of the possible liability for reparation to which the railroads might be subjected if the legality of the order were not determined and the influence and effect which the existence of the rate fixed for two years, if it were legal, would have upon the exercise by the railroads of their authority to fix just and reasonable rates in the future, clearly causes the case to involve not merely a moot controversy.

> *The decree of the Circuit Court is reversed and the case remanded to that court, with directions to enter a decree declaring the order of the Interstate Commerce Commission to be void, and otherwise granting the relief prayed in the bill.*