SOUTHERN PAC. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

(Commerce Court. June 7, 1912.)

No. 59.

**1.** COMMERCE (§ 95*) — INTERSTATE COMMERCE COMMISSION — ORDER FIXING RATES.

The claim of a railroad company that an order of the Interstate Commerce Commission fixing a rate on certain classes of lumber was based on considerations which could not legally be taken into account *held* not sustained by the record, and expressly negatived by the opinion of the Commission.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 145; Dec. Dig. § 95.*]

**2.** CARRIERS (§ 26*) — INTERSTATE COMMERCE COMMISSION — ORDER FIXING RATES—VALIDITY.

That in fixing rates on lumber from Willamette Valley points in Oregon to San Francisco and bay points the Interstate Commerce Commission made a classification based somewhat on condition and value, and in fixing a lower rate on rough fir lumber and lath than was permitted on better grades took into consideration the fact that without such rate the lower grades could not be shipped at all in competition with the same grades from points having water transportation, did not invalidate the order, where the rate fixed was just and reasonable in itself.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

In Equity. Suit by the Southern Pacific Company and others, petitioners, against the United States, respondent, Interstate Commerce Commission and the Oregon & Washington Lumber Manufacturers' Association, interveners. On final hearing. Petition dismissed.

For opinion of Interstate Commerce Commission, see 21 Interst. Com. Com'n R. 389.

F. C. Dillard, of Chicago, Ill. (W. W. Cotton, of Portland, Or., C. W. Durbrow, of San Francisco, Cal., and H. A. Scandrett, of Chicago, Ill., on the brief), for petitioners.

Blackburn Esterline, Special Asst. Atty. Gen. (Winfred T. Denison, Asst. Atty. Gen., on the brief), for the United States.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

Joseph N. Teal, of Portland, Or. (Wirt Minor, of Portland, Or., on the brief), for intervening shippers.

Before KNAPP, Presiding Judge, and ARCHBALD, CARLAND, and MACK, Associate Judges.

ARCHBALD, Judge. [1] The rate involved in this case was fixed by the Commission on rough green fir lumber and lath from the Willamette Valley, Or., over the Southern Pacific Railroad to San Francisco city and bay points. The rate published by the carrier was $5 per ton, which applied to lumber of all kinds; and this on complaint the Commission sustained as to everything but the cheap grade

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

named. This character of lumber, however, it classified and gave a reduced rate of $3.50 per ton from points on the east side of the Willamette river, with 25 cents added from points on the west side.

The same question was before the Commission in a previous proceeding, where rates of $3.40 and $3.65, respectively, were fixed. Western Oregon Lumber Mfg. Ass'n v. Southern Pac. Co., 14 Interst. Com. Com'n R. 61. But upon being litigated in the courts it was finally decided by the Supreme Court on appeal that, according to the report of the Commission and the course of the proceedings before it, the rate had not been determined by a consideration of what was intrinsically just and reasonable for the service performed, but was reduced upon the theory that the lumbermen having been induced to enter the Willamette Valley on assurances of a low rate were entitled, on the ground of equitable estoppel, to be protected against an advance. Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 Sup. Ct. 288, 55 L. Ed. 283. The contention now is that in disregard of that decision, with admittedly no new facts before it, the Commission allowed the same views to prevail, merely raising the rate a fraction, so as to have the semblance of compliance, without really undertaking to determine what was a just and reasonable rate.

It is declared by the Commission in the present report that "while a large amount of additional testimony was introduced" at the second hearing, bearing upon the issues involved, "no new facts were developed," and that consequently no further discussion of the testimony was required. But this statement is not to be carried too far. And above all it affords no basis for the argument which is made that, taking the same view of the facts, the Commission allowed the same ideas to prevail, making the same disposition of the case as the result. The new evidence undoubtedly was cumulative, and simply carried the case down to the time of the last hearing, thus presenting nothing new or different in kind from what had been previously shown, and that is evidently all that the Commission meant. But the consideration given to these facts by the Commission, as bearing on what was a just and reasonable rate, is clear, and sufficiently sustains the conclusion reached.

As pointed out by the Commission the net earnings per mile of the Oregon & California Railroad while the $3.40 rate was in force were much in excess of those of many other strong roads, while the ratio of operating expenses to operating revenues was materially less; this going to show that no serious consequences to the road would result from this supposedly low rate. Nor, as it is said, having regard to the average haul of this lumber, was the rate per ton per mile unjust, there being many instances where for corresponding distances lower rates were voluntarily put in force. Going on to discuss certain cases relied on by the carrier, in which it was charged that the Commission had allowed rates for the transportation of lumber with which the rate in question unfavorably compared, it was further pointed out that in all but one of these the conditions were not analogous, and in that one, all things considered, the rate of 14 cents per hundred

pounds, while perhaps yielding more by reason of the low cost of transportation, was distinctly lower in effect than the rate here pre-scribed. A recent instance investigated by the Commission is also alluded to, where the transportation of lumber for about the same distance as here involved was solicited by a prominent carrier, al-though its division amounted to but $1.40 per ton. And, finally, hav-ing regard to the average load per car of rough green fir lumber and the average haul over the Oregon & California road, it was shown that the car mile earnings were 16 cents, while the average car mile earnings for all the roads of the United States for the year ending June 30, 1910, were but 14.9; and that, while the exact car mile earnings on all traffic of this road did not appear by the figures fur-nished by the company, yet an examination of those figures indicated that the earnings on the lumber in question were nearly, if not quite, equal to the average, although considering the longer average haul they might well be less, from which there could be no doubt that the business at the rate prescribed yielded the carrier a handsome profit above the cost of transporting it. It is upon these and other consid-erations which are stated that the order of the Commission is ex-pressly based.

It is said, however, that the Commission does not stop with this, but goes on to reassert the right to consider the agreement made by the carrier by which the original $3.10 rate was put into effect, on which the lumber industry of the Willamette Valley was built up, in the face of the decision of the Supreme Court that it had no right to do this, and that, entering into the action of the Commission as it so did, the order is void. This contention is based on the following observations in the report: Referring to the original agreement by the Southern Pacific that rates should be made to San Francisco which would fairly meet the water competition from Portland, it is there said:

"The Supreme Court seems to have understood that the Commission was controlled largely by this consideration, and that its real purpose was not to establish a rate just and reasonable, but rather to compel a performance of this agreement and prevent the inequity which would result from its viola-tion. * * * This Commission has never understood that it could dictate the policy of a carrier in the making of its rates, in so far as there was just room for the exercise of a policy. It has several times explicitly so de-clared. We have, however, believed that we might consider what the policy of a carrier had been in determining whether the rates resulting from a change in that policy were just and reasonable. It often happens that the very existence of an industry depends upon the rate accorded to it. If, now, a carrier has established a particular rate for the express purpose of ena-bling an industry to exist, and if, upon the strength of that rate, money has been invested which must be destroyed if the rate is withdrawn, it has been our understanding that this fact might properly be considered in passing upon the reasonableness of the proposed change in the rate. Such fact is not controlling, but is one of the circumstances which may properly be kept in view. It has been our opinion that we might in a proper case order the continued maintenance of a rate upon which the investment of money had been induced, even though we would not in the first instance, as an original proposition, have directed the establishment of that rate.

"The policy of a railroad cannot be dictated entirely by its own interest. It cannot arbitrarily change that policy from day to day when those changes

result in undue hardship to its patrons. The welfare of the public, as well as its own welfare, must be considered. To that extent this Commission has believed that it might control the policy of carriers, and to that extent alone. It is still of the opinion that this must be so unless the property rights of shippers are to rest in the arbitrary whim of the carrier without the right of appeal to any tribunal. We do not understand that the Supreme Court in its decision has held the contrary. But in the present case, to avoid all possibility of question, it has seemed proper to lay entirely out of view everything which transpired between these parties· in the nature of contract, agreement, or assurance.

"After full hearing and upon full consideration of the whole matter, we are of the opinion that the rate of $5 per ton, in so far as it applies to rough green fir lumber and lath, is unjust and unreasonable, and that for the future the rate upon these commodities to San Francisco and bay points, as defined in the tariffs of the defendants, should not exceed $3.50 per net ton of 2,000 pounds from points upon the line of the defendant east of the Willamette river, except from the Wendling branch, so called, and that rates from the Wendling branch and from stations upon the west bank of the Willamette river should not exceed $3.75 per net ton."

The Commission is entitled to have this taken exactly as it reads, and there can be no reasonable controversy as to what is so said. There is no suggestion, as before, that by reason of assurances held out to the lumbermen the carrier was to be regarded as estopped, and, on the contrary, there is an express repudiation of any such idea. The attempted vindication of the former ruling of the Commission was not necessary to the present decision and might appropriately have been omitted. But it is of no consequence unless it betrayed a contumacious purpose on the part of the Commission, which influenced its decision, and this it is plain could not be reasonably asserted. Not only is there the explicit declaration that everything in the way of agreement or assurance had been put out of view, followed by the statement that upon full consideration the rate of $5 a ton as applied to rough green fir lumber and lath in the opinion of the Commission was unjust and unreasonable, and for the future should not exceed the lower amount named; but the inducing reasons for this are given, as shown above, and sufficiently sustain the conclusion reached. The action of the Commission is thus put upon unexceptionable grounds, which the observations and criticisms indulged in are ineffective to disturb.

[2] It is further said that there is no justification for classifying rough green fir lumber and lath from the Willamette Valley, all lumber as a rule, regardless of condition or value, taking the same rate between the same points, this being true also on shipments by rail from Portland, with which the Willamette Valley competes. There is no occasion for classification at Portland, as the Commission points out, the cheaper grades of lumber from there uniformly going by water, and the matter thus taking care of itself.

It is said again, however, that this discloses the real purpose of the reduction on this grade of lumber, which is to bring the rate down to the level of water transportation from Portland, with which it is thrown in competition, making the rate thus on its face unjust. It may be that the Commission had the necessities in this respect of the lumber industry of the Willamette Valley somewhat in mind, and

that this to a certain extent influenced the result reached. But, as is pointed out by the Commission, rough green fir lumber and lath is the cheapest kind of lumber manufactured, the value per car load not exceeding one-half that of the better grades of dried and dressed. It cannot move to market, therefore, from the Willamette Valley unless it gets an encouraging rate, without which, regardless of competition, it will be left in the woods, or be sent to the scrap heap and burned. It also loads heavier than dry lumber, the average of the one being 60.000 and the other 50,000 pounds to the car; the discrepancy in the yield of freight per car being thus in part made up. Nor is a classification of lumber based on condition and value altogether unknown in transportation circles, exceptions, according to the exigencies of particular cases, being introduced at times by the carriers themselves. A lower rate than for the higher grades of lumber was thus apparently justified in the present instance by these considerations, if not indeed required, and the only question therefore is whether the reduction was unjust.

In fixing the rate of $3.40 per ton on the former complaint, the Commission was no doubt guided in part by the Portland competitive water rate. This rate was met in the early stages of lumbering in the Willamette Valley by the $3.10 rate, given by the railroad, which at one time prevailed. Taking this as a basis, the Commission found that in later years water charters from Portland ranged from 25 to 50 cents per thousand more, and it was therefore considered that $3.40 by rail in comparison might reasonably be charged. On the present hearing this was raised to $3.50, the rate now fixed, a slight advance realizing about $3 additional per car. It may be that in this analysis water competition is given a somewhat prominent part. But not in our judgment to the extent of making the rate thereby reached per se unreasonable and unjust. It is in evidence that, regardless of competition, this cheap grade of lumber, as already stated, could not get to market from the Willamette Valley without a favoring rate, and whether traffic will move at a given rate is always some evidence as to whether the rate responds to the value of the service performed. The Commission had this and the other matters to which reference is made to guide in the conclusion reached. The rate was thus not fixed arbitrarily or without considerations which justified it, and, above all, not for the purpose of enforcing a policy inaugurated by the carrier, which it was held could not equitably be abandoned, but in the exercise of due judgment, after full consideration of the entire subject, as shown by the reasons given for it; and, this being so, the order was lawfully made.

The petition will therefore be dismissed, with costs.