**STATE OF FLORIDA v. UNITED STATES et al. WILSON LUMBER CO. v. SAME. BROOKS-SCANLON CORPORATION et al. v. SAME.***

District Court, N. D. Georgia. January 17, 1929.

*For opinion on rehearing, see 31 F.(2d) 580.

Chas. E. Cotterill, of Atlanta, Ga., August G. Gutheim, of Washington, D. C., Fred H. Davis, Atty. Gen., Edward P. Sanborn, of St. Paul, Minn., Norman, Quirk & Graham and J. V. Norman, all of Louisville, Ky., H. P. Adair, G. L. Rutherford, H. P. Osborne and E. W. Mitchell, all of Jacksonville, Fla., and T. T. Turnbull, of Monticello, Fla., for complainants.

Wm. J. Donovan, Asst. Atty. Gen., and Elmer B. Collins, Sp. Asst. Atty. Gen., for the United States.

J. Stanley Payne, Sol., of Washington, D. C., for defendant Interstate Commerce Commission.

James A. Perry, Sol., of Atlanta, Ga., for intervener Georgia Public Service Commission.

Before WALKER, Circuit Judge, and DAWKINS and SIBLEY, District Judges.

SIBLEY, District Judge. Three bills, one by the state of Florida, one by the Wilson Lumber Company, and one by Brooks-Scanlon Corporation, Wilson Cypress Company, and Cummer Cypress Company, were brought against the United States and the Interstate Commerce Commission to enjoin and set aside so much of an order of the Commission, dated August 2, 1928, as required the Atlantic Coast Line Railroad Company to establish and put in force in intrastate commerce, within the state of Florida, certain rates on logs which were, in the same order, fixed as reasonable in interstate commerce. The Georgia Public Service Commission was allowed to intervene in all three cases in behalf of the order attacked. The bills make similar allegations of fact and substantially similar contentions as to the invalidity of the order. The state of Florida is especially concerned because of its claim of an unwarranted invasion of its control over intrastate freight rates, and the other complainants, because of their interest as shippers, in continuing the much lower rates superseded by the order. The contentions of invalidity make these main questions: (1) Is the order within the lawful powers of the Commission? (2) Is it within the issues sought to be investigated and made after full hearing of them? (3) Is it arbitrary because unsupported by sufficient evidence? (4) The state of Florida and Wilson Lumber Company, construing the order as abrogating the Coast Line's intrastate log rates throughout the state of Florida rather than within the limited territory for which new interstate rates were fixed, make the special and newly raised contention of an entire want of evidence to support so broad an order. The assailed order arose out of a complaint filed by the Georgia Public Service Commission against the Atlantic Coast Line Railroad Company touching Coast Line interstate rates on logs from Florida to Georgia and intrastate rates thereon within Florida. The Governor of Florida was duly notified thereof and the Florida Railroad Commission appeared in defense of its rates. The other defendants here, with other sawmill operators and railroad companies, intervened, but expressly without enlarging the issues proposed. The proceedings had are clearly stated in the report of the Commission together with the history of the rates involved and the scope of the evidence taken, and these need not be repeated. The result was an order passed by Division 4, afterwards confirmed by the whole Commission, fixing new interstate rates from points on the Atlantic Coast Line Railroad north of and including Jacksonville, Gainesville, Burnett's Lake, and High Springs, Fla., to destinations on its lines in Georgia, and then ordering a conformity thereto of intrastate rates.

1. The order touching the intrastate rates is based upon a finding that the former intrastate rates "did and would result in undue preference and advantage of shippers of intrastate traffic within the State of Florida, in undue prejudice to shippers of interstate traffic from points in the State of Florida to points in the State of Georgia, and in unjust discrimination against interstate commerce." This finding is in the very words of section 13(4) of the Interstate Commerce Act taken from the Transportation Act of 1920 (41 Stat. 484; 49 USCA § 13(4). The subsection declares that when, in investigating a rate made or imposed by authority of any State, such a condition is found, the Commission "shall prescribe the rate, fare, or charge, * * * thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rate, fare, or charge * * * shall be observed * * * the law of any State or the decision or order of any State authority to the contrary notwithstanding." Assuming for the present the propriety of the preliminary finding, the order here made is clearly within the duty prescribed and the power given by the quoted words. No attack has been made before us upon the constitutionality of the enactment. Such an attack would probably be sufficiently met by what was said in the suit of Wisconsin Railroad Commission v. C. B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086. We recognize that because of the practical involvement and competition of almost all business done interstate with similar business done intrastate, the power here given may easily lead to an almost complete fixing of intrastate rates by the Interstate Commerce Commission. This results from the precedence to be given, under the Constitution, to regulations by federal power of what is under federal control over conflicting regulations by state power of what is under state control. Undue encroachment of federal power is to be guarded against in this as in other fields by a scrupulous care to act with caution and comity, and particularly where the activity is only incidental to a superior federal authority, as is the case in the direct prescription of an intrastate rate, must the

intrusion upon state authority be limited to the actual, plain, and substantial necessities of the particular situation.

The contention that the intrastate rates here investigated by the Commission were not those contemplated by section 13(4), because they were voluntarily initiated by the carrier, and therefore not "made or imposed by authority of any State," within the description of section 13(3), we must overrule. The rate as originally proposed by the carrier was required to be substantially modified before it was allowed filed by the Florida Railroad Commission; and independently of that fact, its status as a lawful rate depended upon its allowance by the Florida Commission. It was established as a rate in accordance with and under the laws of Florida, and was for this reason alone a rate made, though not imposed, by authority of the state.

The further contention is made that the power in the Interstate Commerce Commission to directly prescribe an intrastate rate, which was introduced by the Transportation Act, is to be limited to cases of general horizontal raises in state rate systems, based on a finding that the state rate system is prejudicing interstate commerce by not affording its fair proportion of financial support to the carrier, and that such findings are appropriate only to investigations instituted by the Commission itself. We think the contention unsustainable in whole or in part. It may be true, as stated in the argument, that all previous direct prescription of intrastate rates by the Commission have been on its own initiative, but the language of the act is without any such restriction. Section 13(4) begins: "Whenever in any *such investigation* the Commission, after full hearing, finds." The words "such investigation" plainly relate to the preceding section, 13(3), enacted at the same time, which in turn begins thus: "Whenever in *any investigation* under the provisions of this Chapter, * * * there shall be brought in issue any rate, * * * made or imposed by * * * any State." The preceding, older, portions of section 13 deal with investigations initiated by any person, firm, or corporation, or by the common carrier, or by a railroad commission, or the Interstate Commerce Commission itself. Inevitably subsection 4 includes state rate investigations of all origins. Further, these words are not especially descriptive of general horizontal raises in all rates, but the Commission is authorized to "prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification,

regulation, or practice thereafter to be observed." Under this any particular rate may be separately dealt with, and even classifications and practices in almost infinite detail, in such manner as in the Commission's judgment will remove the unjust discrimination against interstate commerce which is found to exist. It is true that in the case of Wisconsin Railroad Commission v. C. B. & Q. R. R. Co., supra, the investigation was instituted by the Commission itself, and the discrimination there found related to an unfair lowness in the general level of intrastate passenger fares, and that the language and argument of the decision are colored by these facts and adapted to them. But there is no holding in that case, or those following it, that the only unjust discrimination against interstate commerce which is remediable under section 13, subsec. 4, by direct prescription of intrastate rates, was such an one as there involved. On the contrary, the effort in that opinion was to prove that such a discrimination was to be added to those already familiar, arising, not from insufficient returns to the carrier from the intrastate rates, but from discriminatory inequalities between them and the interstate rates, such as existed in the case at bar and such as were dealt with in Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; American Express Co. v. State ex rel. Caldwell, 244 U. S. 617, 37 S. Ct. 656, 61 L. Ed. 1352; and Illinois Central Railroad Co. v. Public Utilities Commission of Illinois, 245 U. S. 493, 38 S. Ct. 170, 62 L. Ed. 425.

2. Section 13(4) conditions the direct prescribing by the Commission of an intrastate rate upon there having been a full hearing in such an investigation as subsection 3 authorizes. Subsection 3 applies to an investigation in which "a rate made or imposed by authority of any state shall have been brought in issue," and requires that the state interested shall be notified. The state of Florida was in this instance notified and appeared by its Commission. By section 13(1) (2) of the act, and by the rules of practice of the Commission, the issues for investigation are to be defined in writing, by quasi pleadings of the parties, or by orders of the Commission as to what shall be investigated. The issues in this matter were defined by the original complaint of the Georgia Public Service Commission, unchanged by the interventions or answers, or by any directions of the Interstate Commerce Commission. This complaint, besides attacking the intrastate rates on logs from all points on

the Coast Line Railroad in Florida to all in Georgia, specifically exhibited and assailed the Florida intrastate rates on logs (see paragraph 11) both as giving undue and unreasonable preference and advantage to intrastate shippers, and as being unduly prejudicial to interstate shippers, but also as causing "undue and unreasonable, and unjust, discrimination against interstate commerce in violation of Section 13 of the Interstate Commerce Act." The prayers of the complaint did not ask a raise of the intrastate rate, but did ask parity between interstate and intrastate rates and that the aforesaid violation of the Interstate Commerce Act be stopped. . If any of the violations of the act complained of being such as are mentioned in section 13(4) were found to exist, the remedy to be applied is; by the words of the subsection, left to the judgment of the Commission. It was not necessary that the complainant should select and pray for a particular solution of the difficulty. To do so might be thought to confine the Commission to the use of that remedy only. The complaint went far enough in stating the facts and in asserting that a discrimination against interstate commerce existed as a result. The state rate was thereby clearly put in issue and the power of the Commission under section 13(4) invoked.

■ We do not think the oral statement attributed to the chairman of the Georgia Commission during the examiner's hearing, to the effect that he desired the lowering of the interstate rate, rather than the raising of the intrastate rate, either changed the issues or limited the action of the Interstate Commerce Commission. Neither the examiner nor the counsel in their subsequent arguments before the Commission understood that the claim of discrimination by the intrastate rates against interstate commerce had been eliminated. If it existed, whether removal of it ought to be accomplished by lowering interstate rates or by raising the intrastate rates was a question for the decision of the Commission alone, and not of the contesting parties. On that question the remunerativeness to the carrier of the state rates was plainly a relevant matter and was of importance on that question only. The Florida Commission itself presented evidence touching it. The hearing was therefore not prevented from being full and fair by any mistake of the participants as to the issues that were to be investigated.

3. We find substantial evidence to sustain the conclusions of the Commission on all material points. The chief contention to the contrary is that the evidence discloses

such complete ownership of the sources of logs in Florida by Florida mills as to insure their moving to their owners and leaving no substantial amount which could move to Georgia on the interstate rates fixed, with the result that in no real or fair sense could it be held that the low intrastate rates did prejudice or discriminate against interstate shippers or interstate commerce. This contention is well supported so far as concerns large tracts of timber, logs from which would move in train loads, as do most of those in Florida now handled by the Coast Line Railroad. But the rate assailed is not a trainload rate, but a carload rate, and the evidence abundantly justifies the conclusion that there is an indefinite quantity of what is called "scattered timber," not yet cut, in north Florida, which is not owned by Florida mills and which the Commission could find would be as likely to move to Georgia as to Florida points if a rate parity were afforded.

■ 4. A more troublesome question is that raised by the state of Florida and Wilson Lumber Corporation (paragraph 18e of the one bill and paragraphs 7 and 10 of the other) that the evidence, and the findings of the Commission, related only to North Florida, while the order complained of fixes intrastate rates for the whole of Florida, and was unjustified according to the rulings in Wisconsin R. R. Commission v. C. B. & Q. R. R., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086, and Ill. Central R. R. Co. v. Public Utilities Comm. of Ill., 245 U. S. 493, 38 S. Ct. 170, 62 L. Ed. 425. From a cursory search of the record it appears to be true that the evidence, though often broadly phrased, really related to the log situation in North Florida, a territory described by the Commission in its order establishing new interstate rates as north of and including Jacksonville, Gainesville, Burnett's Lake, and High Springs. No interest, apparently, was taken by any one in the territory more remote from the Georgia line, evidently because the class of logs involved could, under no circumstances, be profitably moved so great a distance. Although the complaint covered the whole of Florida, the real contention, and the Commission's own action upon the interstate rates, were limited to that northern territory, and the evidence related only to it. The precise conditions in South Florida, and whether there could or would be any interstate commerce in logs from that region, were never investigated. The language of the order passed touching the intrastate rates can be construed as fixing rates for the whole state. The two bills above referred to so construed it. The respondents in answering the bill

of the state of Florida seem to deny this construction. The answers to the bill of Wilson Lumber Company vary. Those of the Interstate Commerce Commission and Georgia Public Service Commission do not commit themselves to any construction, but leave the order to speak for itself. We think it can also be construed as limited to points of origin on the Coast Line Railroad north of and including Jacksonville, Gainesville, Burnett's Lake, and High Springs. The existence and availability of logs at such origins was fully investigated, and at others not. The Commission confined its order on interstate rates expressly to these origins, and dealt with the intrastate rates only by a reference to the order fixing the interstate rates, declaring that the rates "in intrastate commerce within the state of Florida shall be the same as those prescribed in the next preceding paragraph hereof as reasonable for transportation in interstate commerce from points in the State of Florida to destinations in the State of Georgia." The preceding paragraph fixes only one-way rates, and was limited to origins on the Coast Line Railroad in the State of Florida north of and including Jacksonville, Gainesville, Burnett's Lake, and High Springs. The destinations in Georgia there referred to were, of course, excluded by the words "within Florida" in the order as to intrastate rates. Otherwise the intrastate rates were to be the same.

Since the first construction would probably nullify the order, we think we should follow the established rules in construing contracts and statutes, holding to the latter construction which would uphold it. Territorial indefiniteness of the order was held aided by the other proceedings in American Express Co. v. State ex rel. Caldwell, 244 U. S. 617, 37 S. Ct. 656, 61 L. Ed. 1352.

The serious effect of altering the rates upon the business of complainants and their investments made on the faith of them is strongly urged. Such things may be considered by the Commission in determining what is just and reasonable, or undue or unfair, without vitiating their finding (I. C. C. v. Union Pacific R. Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308), and were considered in this case. But such considerations cannot be the sole basis of a rate order. Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283. A fortiori they alone cannot avail in this court to overturn an unfavorable order.

We find no sufficient cause to enjoin and set aside the order here complained of.