**NORTHERN PAC. RY. CO. et al. v. BAKER et al.**

No. 456.

District Court, W. D. Washington, S. D.

March 21, 1933.

Thomas Balmer and A. J. Clynch, both of Seattle, Wash., for plaintiff Great Northern Ry. Co.

Arthur C. Spencer, of Portland, Or., and O. G. Edwards, of Seattle, Wash., for plaintiff Oregon-Washington R. & Nav. Co.

G. W. Hamilton, Atty. Gen., John H. Dunbar, (former) Atty. Gen., and John C. Hurspool, Asst. Atty. Gen., for defendants.

Hance H. Cleland and Raymond W. Clifford, both of Olympia, Wash., for defendant J. L. Bridge.

Before WILBUR, Circuit Judge, and PRAY and CUSHMAN, District Judges.

CUSHMAN, District Judge (after stating the facts as above).

Because of the fact that certain shippers who shipped logs after the issuance of the interlocutory injunction and prior to the filing of the tariffs so reducing log rates were not parties to the settlement, they would have a right of action upon the bonds given by plaintiffs at the time of securing the interlocutory injunction, should such injunction have been wrongfully granted. For this reason, despite the fact of the filing of such later tariffs reducing rates, the present suit has not become moot. Groesbeck v. Duluth, South Shore & Atlantic Railway Company, 250 U. S. 607–609, 40 S. Ct. 38, 63 L. Ed. 1167; Southern Pacific Company v. Interstate Commerce Commission, 219 U. S. 433–452, 31 S. Ct. 288, 55 L. Ed. 283.

No suggestion has been made that jurisdiction be retained because of the fact that the tariffs filed after the bringing of suit "postponed" the effective date of the tariffs involved in the suit until and including September 9, 1935.

The claimed want of requisite findings by the department will be first considered. In so far as deemed necessary upon this point, the findings are as follows:

"Economic facts have always exerted a definite influence upon the rate making processes of both carriers and regulatory bodies. If economic facts were to be disregarded there would be little occasion for the classification of freight. That a regulatory body has authority in the exercise of its rate making power to consider economic facts and specifically to consider the conditions in a particular industry is sufficiently declared in the recent decision of the United States Supreme Court in Ann Arbor Railroad Company et al. v. United States et al., 281 U. S. 658, 50 S.

L. B. da Ponte, and Thos. H. Maguire, both of Seattle, Wash., and J. W. Quick, of Tacoma, Wash., for plaintiff Northern Pac. Ry. Co.

F. M. Dudley, I. S. Crawford, and O. G. Edwards, all of Seattle, Wash. (A. J. Laughon, of Seattle, Wash., on the brief), for plaintiff Chicago, M., St. P. & Pac. R. Co.

Ct. 444, 74 L. Ed. 1098 from which the following is quoted:

" 'In rate making under existing laws it has been recognized that conditions in a particular industry may and should be considered along with other factors in fixing a rate for that industry and in determining their reasonableness; and it has also been recognized that, so far as can be done with due regard for the interests affected, rates should be such as will permit the commodities to which they relate to move freely in the channels of commerce.' * * *

"The Department in order to determine as nearly as possible the actual situation as to rail movement of lumber manufactured by mills receiving logs over the lines of respondents made an investigation of this subject. We first secured from all of the principal log shippers the total footage of their log shipments over respondents' lines for the year 1929 by consignees. The total log shipments of 23 log shippers amounted to 1,112,381,-895 feet. We then secured details of the rail shipments of the identical sawmills receiving the logs. The result was that these mills shipped in the same year via respondents' lines 4,225 carloads of manufactured products to destinations in Washington and Oregon and 39,143 carloads to long-haul destinations beyond the borders of the above states. Based upon an average of 27,000 feet per car furnished by the West Coast Lumbermen's Association which was secured by a study of the 1927 shipments of its members this equals 1,170,936,000 feet; a small excess over the total footage of inbound logs.

"It is true that the outbound movement was not divided as between the various carriers in accordance with the inbound log movement. Some of the roads got more and others less than the equivalent of logs hauled in, but as a whole respondents did receive more outbound lumber from these mills than the product of the inbound logs. * * *

"Mr. Peterson and other witnesses for the N. P. selected the month of November, 1927, which the record shows to have been a better than average month, and endeavored to find the actual cost of transporting logs during that month. * * *

"The Department is of the opinion and finds that the distance rates and scaling rules named in Tariff No. 51–B are unjust and unreasonable and more than the traffic can bear. The Department is of the further opinion that the said distance rates are improperly constructed, particularly in the lower steps. For example, the difference

in the mileage rate between the first two steps is 22 cents; between the second and third step the difference is 16 cents and thereafter the scale increases 8 or 9 cents for each five miles up to one hundred miles. The Department can see no justification for this disproportionate variation. The record and particularly Mr. Peterson's exhibit, shows that the greater portion of the costs of the log traffic would not be materially affected by a difference of five miles in the haul. Obviously, such major items as switching costs, trainmen's wages and interest charges would not ordinarily be so affected.

"The Department is of the opinion and finds that the following schedule of maximum rates per car, based on the use of cars not exceeding 43 feet in length and 80,000 pounds capacity, is just, fair and reasonable for logs in Western Washington:

| | |
|---|---|
| 10 miles or less | $16.50 |
| Over 10, not over 15 miles | 17.00 |
| Over 15, not over 20 miles | 17.50 |
| Over 20, not over 25 miles | 18.00 |
| Over 25, not over 30 miles | 18.40 |
| Over 30, not over 35 miles | 18.80 |
| Over 35, not over 40 miles | 19.20 |
| Over 40, not over 45 miles | 19.60 |
| Over 45, not over 50 miles | 20.00 |
| Over 50, not over 55 miles | 20.40 |
| Over 55, not over 60 miles | 20.80 |
| Over 60, not over 65 miles | 21.20 |
| Over 65, not over 70 miles | 21.60 |
| Over 70, not over 75 miles | 22.00 |
| Over 75, not over 80 miles | 22.40 |
| Over 80, not over 85 miles | 22.80 |
| Over 85, not over 90 miles | 23.20 |
| Over 90, not over 95 miles | 23.60 |
| Over 95, not over 100 miles | 24.00 |
| Over 100, not over 105 miles | 24.40 |
| Over 105, not over 110 miles | 24.80 |
| Over 110, not over 115 miles | 25.20 |
| Over 115, not over 120 miles | 25.60 |
| Over 120, not over 125 miles | 26.00 |
| Over 125, not over 130 miles | 26.40 |
| Over 130, not over 135 miles | 26.80 |
| Over 135, not over 140 miles | 27.20 |
| Over 140, not over 145 miles | 27.60 |
| Over 145, not over 150 miles | 28.00 |
| Over 150, not over 155 miles | 28.40 |
| Over 155, not over 160 miles | 28.80 |
| Over 160, not over 165 miles | 29.20 |
| Over 165, not over 170 miles | 29.60 |
| Over 170, not over 175 miles | 30.00 |
| Over 175, not over 180 miles | 30.40 |
| Over 180, not over 185 miles | 30.80 |
| Over 185, not over 190 miles | 31.20 |
| Over 190, not over 195 miles | 31.60 |
| Over 195, not over 200 miles | 32.00 |

"The rates found reasonable herein for ten miles and under and for other short distances are substantially higher than the existing or proposed rates. We feel that since these rates for short-haul movements require the same amount of terminal service, and since practically the same use is made of the equipment as in the longer haul movements, respondents are entitled to relatively higher rates for short hauls. The record indicates that there is a growing tendency to move

short-haul shipments of logs over the highways by truck. Since our order provides maximum rates, respondents will be left in a position to exercise managerial discretion in the matter of providing lower rates to meet auto truck competition when they can be justified by the circumstances encountered in such cases.

"The exhibits of respondents show the details of their log movements for various periods. The N. P. made a complete study of individual movements for the month of November, 1927, showing distances hauled and revenue collected. While certain figures were shown for other periods they were not in sufficient detail for the purpose of determining revenue results. Later figures were not available because when the N. P. sought to make a more up-to-date study it was found that many of the important movements had been suspended on account of the depressed conditions. G. N. revenue figures relied upon were for November, 1929, and total movement figures were for the year 1929. The Milwaukee figures were for the year 1929. It was therefore impossible for the Department to determine exactly the revenue increases which would result based on the present log movement or to estimate what that movement might be in the future.

"From the information of record the Department constructed a composite statement to show the number of cars moved over distances up to fifty-five miles on all three roads in an average year and the total revenue collected by the three. This was done by taking the G. N. and Milwaukee figures as submitted and by considering the November movement and revenue of the N. P. as one-tenth of the total for the year. The resulting table includes 95 per cent. of the total N. P. log haul, 92 per cent. of the Milwaukee, and 59 per cent. of the G. N., its major movements in Western Washington. The figures show that in an average year, the three carriers would transport over varying distances up to fifty-five miles a total of 178,655 cars of logs, on which they would collect $3,096,560.71. The rate schedule herein provided, if applied to the same movement, would produce $3,312,-168.60, or an increase of $215,607.89. The saving to the carriers of the cost of scaling at 30 cents per car would amount to $53,596.-50. The total of these sums is $269,204.39, representing an increase of 8.6 per cent. over the present revenue."

From the foregoing it is clear that no finding was made as to the amount of the rate base in the case of any plaintiff, nor as to the gross revenue from, the expense of nor the net revenue from the carriage of logs at the time of the hearing or at all, nor is there any finding as to what would be a reasonable rate.

Sections of the Washington statute relating to procedure before the department are: Section 53, c. 117, Laws 1911, p. 571; section 80, c. 117, Laws 1911, p. 592, as amended by section 1, c. 145, Laws 1913, p. 452; section 81, c. 117, Laws 1911, p. 593; section 1, c. 133, Laws 1915, p. 362, amending section 8626—82, Remington's & Ballinger's Annotated Codes and Statutes of Washington, Supplement 1913, being section 82, c. 117, Laws 1911, page 594. These sections appear in Remington's Revised Statutes of Washington, Annotated, as sections 10389, 10422, 10423, and 10424. The duties of the commission (now department) are more particularly described in sections 10389 and 10423.

The duty of the department in the particular matter now in question is stated in the last numbered section, as follows: "At the conclusion of such hearing the commission shall make and render findings concerning the subject matter and facts inquired into and enter its order based thereon."

The Supreme Court of the state of Washington has recently considered the construction to be given the foregoing. Great Northern Railway Company et al. v. Department of Public Works et al., 161 Wash. 29, 296 P. 142, 143. In this case the court stated:

"Before passing to the questions in controversy on the appeal, we feel impelled to call attention to the indefiniteness and uncertainty of the findings of fact made by the department. The statute (Rem. Comp. Stat. § 10423) requires the department, at the conclusion of the hearing, to 'make and render findings concerning the subject-matter and facts inquired into.' This contemplates a statement of the facts found in direct and certain language, sufficiently clear as to leave no misunderstanding as to their meaning and purport. The findings in this instance are not thus direct and certain. * * *

"However, the department did find that 'the rate assailed is and for the future will be unreasonable to the extent that it exceeds 9 cents,' and this possibly is a sufficient finding to support its order if there is substantial evidence in its support. But we find no such evidence in the record. * * *

"The learned counsel for the complainant contends that the evidence introduced at the hearing supports the order of the department, and that the court may, if it so concludes, disregard the findings made by the

department, and affirm its order merely because it is so supported. But this contention mistakes the functions of the court. The power to fix the rates of a common carrier is a legislative power, and the court's power is limited to the inquiry whether the findings and conclusions of the body to which the power is delegated are justified by the record it makes. The rule can be no better stated than it is stated in a recent decision of the Supreme Court of the United States (Florida v. United States [282 U. S. 194], 51 S. Ct. 119, 125, 75 L. Ed. 291), wherein it is said:

"'The question is not merely one of the absence of elaboration or of a suitably complete statement of the grounds of the Commission's determination, to the importance of which this court has recently adverted (Beaumont, Sour Lake & Western Railway Company v. United States, decided November 24, 1930, 282 U. S. 74, 51 S. Ct. 1, 75 L. Ed. 221), but of the lack of the basic or essential findings required to support the Commission's order. In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit. The Commission is the fact-finding body, and the court examines the evidence not to make findings for the Commission but to ascertain whether its findings are properly supported.'"

The Supreme Court of the state of Washington in the above case found that the findings of the department, which were similar in character to those here in question, were not made in conformity with the statute. It further found that the department's finding that the rates were unreasonable was not supported by the evidence. The question is, Should this court disregard the conclusion of the Supreme Court of the state that findings such as those shown to have been made by the department in the present case, were not in conformity with the statute, because that court in the end decided that the general finding by the department that a rate was unreasonable was unsupported by the evidence?

■ As has been shown the present suit not only arises under the Constitution of the United States but involves the question of whether the execution of the department's orders should be enjoined because they were not made in accordance with state law. Under such circumstances the court has jurisdiction to decide the state law, without deciding the federal question. Greene v. Louisville & Interurban R. R. Co., 244 U. S. 499, 508, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas.

1917E, 88; Louisville & Nashville R. R. Co. v. Greene, 244 U. S. 522–527, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; Davis v. Wallace, 257 U. S. 478–482, 42 S. Ct. 164, 66 L. Ed. 325; Piedmont & N. Ry. Co. v. Query (D. C.) 56 F.(2d) 172–175.

■ This court looks to the courts of the state to explain its statutes. Webster v. Cooper, 55 U. S. (14 How.) 488–503, 504, 14 L. Ed. 510; Concordia Ins. Co. v. School Dist., 282 U. S. 545–552, 51 S. Ct. 275, 75 L. Ed. 528.

■ If the Supreme Court of the state in the above case decided the case upon its construction of the state statute and, as a second ground, upon the lack of evidence to support the finding of the department that the rate in question was unreasonable, the case is authority upon both points. Florida Railroad Company v. Schutte, 103 U. S. 118–143, 26 L. Ed. 327; United States v. Title Ins. Co., 265 U. S. 472–486, 44 S. Ct. 621, 68 L. Ed. 1110.

The question comes to this—in a case where the department had made a general finding that rates were unreasonable and the court held such finding unsupported by evidence, was the following statement of the Supreme Court of the state of Washington, in its opinion (161 Wash. 29 at pages 31, 32, 296 P. 142, 143) dictum: "The statute (Rem. Comp. Stat. § 10423) requires the department, at the conclusion of the hearing, to 'make and render findings concerning the subject-matter and facts inquired into.' This contemplates a statement of the facts found in direct and certain language, sufficiently clear as to leave no misunderstanding as to their meaning and purport. The findings in this instance are not thus direct and certain."

In so far as appears from the report of the case the construction of the statute in the particular in question, in view of the purpose and object in requiring findings, was properly before that court. Two questions were involved in its construction: First, the meaning of the words of the statute as to findings, that is, whether findings general or specific, "direct and certain," "concerning the subject-matter and facts inquired into" were contemplated, and, second, if found that specific findings were contemplated, was the provision mandatory or directory.

The Supreme Court found that specific findings—that is, direct and certain—concerning the subject-matter and facts inquired into were contemplated, but, finding no substantial evidence in the record to support the department's general finding that the rate

to the extent it exceeded 9 cents was unreasonable, it did not expressly decide whether the provision as to such findings—specific findings—was mandatory or directory.

The construction of the statute by the Supreme Court as to what was meant by findings is not dictum though it did not determine the second question. Though no decision to the foregoing effect has come to the court's attention it would seem to fall within the reason of the holding in Mayor etc. of City of Paterson v. East Jersey Water Co., 74 N. J. Eq. 85, 70 A. 472–488.

This leaves for consideration by this court the question of whether the provision for specific findings is a mandatory requirement or not. Railroad Commission of California v. Los Angeles Railway Corporation, 280 U. S. 145–152, 50 S. Ct. 71, 74 L. Ed. 234; Concordia Ins. Co. v. School Dist., 282 U. S. 545–552, 553, 51 S. Ct. 275, 75 L. Ed. 528.

Where a power is given and no express provision is made as to the manner of its exercise, that which is lawful and necessary to the effective execution of the power is implied, State ex rel. R. R. Com. v. Great Northern R. Co., 68 Wash. 257–262, 123 P. 8, 11, but in the present case the statute—as construed—requires "direct and certain" findings, which were not made. Therefore the authority to dispose of the matter upon a general finding that the rate was unreasonable is not to be implied. "The railroad commissioners are statutory officers whose powers are special and limited. They can exercise only such authority as is legally conferred by express provisions of law or such as is by fair implication and intendment incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the purposes for which the offices were established." State ex rel. Ellis v. Atlantic Coast Line Ry. Co., 51 Fla. 578, 40 So. 875.

While the precise question was not before the Supreme Court of the state of Washington, the foregoing was by that court quoted with apparent approval. State ex rel. R. R. Com. v. Great Northern R. Co., 68 Wash. 257–263, 123 P. 8.

In Wichita Railroad & Light Company v. Public Utilities Commission of Kansas, 260 U. S. 48, 43 S. Ct. 51, 54, 67 L. Ed. 124, a case in which the statute provided: "It shall be the duty of the Commission, either upon complaint or upon its own initiative, to investigate all rates, * * * fares * * *

and if after full hearing and investigation the Commission shall find that such rates * * * are unjust, unreasonable, unjustly discriminatory or unduly preferential, the Commission shall have power to fix and order substituted therefor such rate or rates * * *. as shall be just and reasonable," there having been no such finding by the commission, the court held (pages 58 and 59 of 260 U. S., 43 S. Ct. 51, 55):

"The power is expressly made to depend on the condition that after full hearing and investigation the Commission shall find existing rates to be unjust, unreasonable, unjustly discriminatory, or unduly preferential. We conclude that a valid order of the Commission under the act must contain a finding of fact after hearing and investigation, upon which the order is founded, and that for lack of such a finding, the order is this case was void.

"This conclusion accords with the construction put upon similar statutes in other states. Public Utilities Commission v. Springfield Gas & Electric Co., 291 Ill. 209, 125 N. E. 891; Public Utilities Commission v. Baltimore & Ohio Southwestern R. R. Co., 281 Ill. 405, 118 N. E. 81. Moreover, it accords with general principles of constitutional government. The maxim that a legislature may not delegate legislative power has some qualifications, as in the creation of municipalities, and also in the creation of administrative boards to apply to the myriad details of rate schedules the regulatory police power of the state. The latter qualification is made necessary in order that the legislative power may be effectively exercised. In creating such an administrative agency, the Legislature, to prevent its being a pure delegation of legislative power, must enjoin upon it a certain course of procedure and certain rules of decision in the performance of its function. It is a wholesome and necessary principle that such an agency must pursue the procedure and rules enjoined, and show a substantial compliance therewith to give validity to its action. When, therefore, such an administrative agency is required as a condition precedent to an order, to make a finding of facts, the validity of the order must rest upon the needed finding. If it is lacking, the order is ineffective."

It follows that the department's orders, made without the findings contemplated by the statute, were invalid and that there is no liability upon the injunction bonds except in one particular presently to be considered. Beaumont, S. L. & W. Ry. v. United

States, 282 U. S. 74–82, 86, 51 S. Ct. 1, 75 L. Ed. 221.

■ There will next be considered the complaint of plaintiffs that the department "based its order prescribing rates most largely, if not entirely, on the stated economic conditions of the lumber and logging industries, without finding the material and relevant facts bearing on the reasonableness and sufficiency of existing rates, the rates proposed by Tariff 51–B or the rates prescribed by the order."

A proper consideration of this contention warrants setting forth portions of the department's findings, repeating, in part, what has already been set forth. This includes the following:

"The logging industry in Washington is in a depressed condition at the present time. Many large operations have been suspended on account of lack of demand for logs. In 1928 saw-mills in Washington operated to 75 per cent. of capacity; in 1929, 70 per cent.; in the first eight months of 1930, 53 per cent., and in the last four months of that year, 45 per cent. A survey made in September, 1930, showed 625 active sawmill operations in Washington and Oregon. Of these 291 mills had manufactured no lumber during the third quarter of that year. At the end of 1930 production was estimated to be not over 30 per cent. of capacity.

"A serious handicap to the lumber industry in Washington is its geographical location with relation to major consuming markets. Forty-five per cent of shipments move by rail, twenty per cent. intercostal to Atlantic seaboard, seventeen per cent. by water to California, and the balance to foreign markets. Washington lumber, particularly that moving overland, must compete with southern pine, middlewestern pine and lumber from other sources nearer to consuming markets which have more favorable freight rates. No important consuming districts are available to Washington lumber shipped east by rail nearer than 1500 miles distant where the freight rate is 62½ cents per 100 pounds. The ever-increasing competition from brick, steel, cement, fiberboard and other lumber substitutes has added to the difficulty of selling western lumber in middlewestern, eastern and southern districts. Consumption of lumber in the United States has declined about one-fifth in the last 20 years, and the per capita consumption has declined about one third during that period.

"Washington and Oregon have sawmill capacity of approximately 15 billion board feet annually. This capacity is greatly in excess of the demand. Aggregate production runs approximately 25 per cent. clear or high-grade lumber. The balance of the product of the average mill is of the lower grades. Even under normal conditions a part of that product does not return the cost of logging and manufacturing. The unavoidable production of this low-grade lumber represents an important economic problem. At the present time large stocks on hand run preponderantly to these low grades. Much of it has been carried over from the 1929 cut. The difficulty about improving the situation by curtailing production is that private owners are carrying over 400 billion feet of standing timber. Bond obligations, interest on borrowed capital, fire protection and other carrying charges have all contributed to create tremendous financial pressure to liquidate investments. Ever-increasing taxes have accumulated a heavy charge against the original investment. Much of the timber is over-ripe and will deteriorate rapidly if allowed to stand. These conditions make it very difficult to liquidate investment in an orderly manner and yet not oversupply the demand for lumber.

"Economic facts have always exerted a definite influence upon the rate making processes of both carriers and regulatory bodies. If economic facts were to be disregarded there would be little occasion for the classification of freight. That a regulatory body has authority in the exercise of its rate making power to consider economic facts and specifically to consider the conditions in a particular industry is sufficiently declared in the recent decision of the United States Supreme Court in Ann Arbor Railroad Company et al. v. United States et al., 281 U. S. 658, 50 S. Ct. 444, 74 L. Ed. 1098, from which the following is quoted:

" 'In rate making under existing laws it has been recognized that conditions in a particular industry may and should be considered along with other factors in fixing a rate for that industry and in determining their reasonableness; and it has also been recognized that, so far as can be done with due regard for the interests affected, rates should be such as will permit the commodities to which they relate to move freely in the channels of commerce.'

"Respondents show that there has been an appreciable increase in the movement of lumber by water since 1920 from Washington and Oregon ports. The N. P. presented an exhibit showing that 175 interior lumber and shingle mills on its lines in Western Wash-

ington discontinued operations between 1915 and 1929. It was also stated that all new sawmill operations of any consequence have in recent years located at tidewater. The purpose of this testimony is to show that while in years prior to 1920 respondents enjoyed the haul on a very large proportion of the total lumber manufactured, the situation has changed and for that reason there is not the same incentive to provide low rates on logs as there was under former conditions.

"The Department in order to determine as nearly as possible the actual situation as to rail movement of lumber manufactured by mills receiving logs over the lines of respondents made an investigation of this subject. We first secured from all of the principal log shippers the total footage of their log shipments over respondents' lines for the year 1929 by consignees. The total log shipments for 23 log shippers amounted to 1,112,-381,895 feet. We then secured details of the rail shipments of the identical sawmills receiving the logs. The result was that these mills shipped in the same year via respondents' lines 4,225 carloads of manufactured products to destinations in Washington and Oregon and 39,143 carloads to long-haul destinations beyond the borders of the above states. Based upon an average of 27,000 feet per car furnished by the West Coast Lumbermen's Association which was secured by a study of the 1927 shipments of its members this equals 1,170,936,000 feet; a small excess over the total footage of inbound logs.

"It is true that the outbound movement was not divided as between the various carriers in accordance with the inbound log movement. Some of the roads got more and others less than the equivalent of logs hauled in, but as a whole respondents did receive more outbound lumber from these mills than the product of the inbound logs.

"The Department cannot subscribe to the proposition that log rates, or in fact, rates on any other commodity, should be placed on a noncompensatory basis. Under present conditions logs move largely to tidewater and are there sold on the open market. The ownership is thus transferred from the logger to the sawmill operator. The shipper of logs cannot control the outbound lumber movement."

The findings then continue with a statement of the contentions made by the shippers and the carriers, similar in its nature to that which the Supreme Court of the state held, in Great Northern Railway Company v. Department of Public Works, 161 Wash. 29–32,

296 P. 142, to be proper if separately stated, but not to be findings, for which reason they are omitted, except in the following particular relating to the Engineer Newell retained by the department:

"At the hearing, studies to show the cost of hauling logs were presented by the N. P., the G. N., and the Milwaukee. A study was also presented by J. P. Newell, consulting engineer, who was retained by the Department for that purpose. Mr. Newell is an engineer of wide experience who has been employed in similar work by other regulatory bodies and by railroads in different parts of the United States and Canada, and within three months of his entering our employ, by one of the respondents in the instant case. The studies were all constructed on different bases and are not readily comparable. * * *

"Mr. Newell's exhibit covered the log movement on the N. P. for the year 1928. Mr. Newell divided expenses into direct and indirect; direct expenses being those expenses affected by the volume of traffic. In computing his direct expenses, he considered the effect of grades and curves. Mr. Newell made certain estimates and allocations, which were strongly objected to by the railroads, but equally as strong objections were made to the cost studies of the respondents by the loggers' counsel. Mr. Newell testified that the carriers needed an increase of 4.2% in order to earn 5¾% on log traffic. * * *

"The loggers show that most of their large operations are closed down on account of the low price of logs and lack of demand. They contend that logs cannot stand an increase of the existing rates and that even on the basis of present rates many active operations are being conducted at a loss.

"On the other hand respondents contend that the log traffic is not bearing its proper proportion of their total operating expenses. Much of their testimony was directed to their failure to earn anywhere near the standard return of 5¾ per cent.

"The value of the service is obviously a factor of moment in the adjustment of freight rates. That rates may become so high that traffic is severely curtailed with disastrous effects to industry and to transportation agencies has been demonstrated in many instances. (See Reduced Rates 1922, 68 I. C. C. 676, 732.)

"The Supreme Court of the United States said in Northern Pacific Railway Company v. North Dakota, 236 U. S. 585 at pages 598,

599, 59 L. Ed. 735, 35 S. Ct. 429, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1 (1915):

" 'The legislature, undoubtedly, has a wide range of discretion in the exercise of the power to prescribe reasonable charges and it is not bound to fix uniform rates for all commodities or to secure the same percentage of profit on every sort of business. There are many factors to be considered,—differences in the articles transported, the care required, the risk assumed, the value of the service, and it is obviously important that there should be reasonable adjustments and classifications.'

"In Atchison, Topeka & Santa Fe Railway Company v. United States (Com. Ct.) 203 F. 56, 59, it was said: ' * ° * The carrier has no constitutional right to a rate for each distinct kind of service which will equal its proportionate share of the entire operating expenses.' (Affirmed in 231 U. S. 736, 58 L. Ed. 460, 34 S. Ct. 316.)

"In Dayton-Goose Creek Railway Company v. United States, 263 U. S. 456, page 480, 68 L. Ed. 388; 44 S. Ct. 169, 33 A. L. R. 472 (1924), the Supreme Court said: ' * * * The statute does not require that the net return from all the rates shall affect the reasonableness of a particular rate or a class of rates.'

"In a more recent decision of the same court involving intra-state log rates in Florida (Florida v. U. S., 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 303) the court said: 'The raising of rates does not necessarily increase revenue. It may in particular localities, reduce revenue instead of increasing it, by discouraging patronage.' * * *

"The Department is of the opinion and finds that the distance rates and scaling rules named in Tariff No. 51-B are unjust and unreasonable *and more than the traffic can bear.*" (Italics by the court.)

In a case such as the present there is no way to determine whether a rate is compensatory or not without determining the rate base, the amount received and to be received in the future from the carriage, and the expenses of such carriage. If these were determined by the department upon its hearing, they are not found nor is any reason given or suggested for not stating them in its findings.

These facts, coupled with the foregoing extracts from the findings, justify the conclusion that the department held plaintiffs' filed tariffs unreasonable and the department's tariff reasonable because of the department's view as to the rate the log traffic "can bear" rather than because of any finding

as to the value of the rate base, gross receipts from log carriage, and expenses chargeable thereto. In this particular the case is not dissimiliar to that of the Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433–449, 31 S. Ct. 288, 293, 55 L. Ed. 283 in which the court found: "While it is true that the opinion of the Commission may contain some sentences which, when segregated from their context, may give some support to the contention that the order was based upon a consideration merely of the intrinsic unreasonableness of the rate which was condemned, we think when the opinion is considered as a whole, in the light of the condition of the record to which we have referred, it clearly results that it was based upon the belief by the Commission that it had the right under the law to protect the lumber interests of the Willamette valley from the consequences which it was deemed would arise from a change of the rate, even if that change was from an unreasonably low rate which had prevailed for some time to a just and reasonable charge for the service rendered for the future."

Such a course is fundamentally wrong. Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283; Interstate Commerce Commission v. Stickney, 215 U. S. 98–109, 30 S. Ct. 66, 54 L. Ed. 112; Northern Pacific Ry. v. North Dakota, 236 U. S. 585–599, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Northern Pacific v. Department of Public Works, 268 U. S. 39–43, 45 S. Ct. 412, 69 L. Ed. 836; Chicago, Milwaukee & St. Paul Railway Company v. Public Utilities Commission of Idaho, 274 U. S. 344–350, 352, 47 S. Ct. 604, 71 L. Ed. 1085; Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U. S. 396, 40 S. Ct. 183, 64 L. Ed. 323.

The order of the department changed the rate from one in cents per thousand scaled feet to a schedule of maximum rates per car based on the use of cars not exceeding 43 feet in length and 80,000 pounds capacity.

The complaint of the shippers filed with the department; while it alleged that an unreasonable increase in charges would result because the plaintiffs' proposed tariff: "changes the method of assessing charges with respect to the scaling of logs transported," yet it contained no prayer for the fixing of rates on a carload basis instead of that theretofore used of fixing such rates with relation to the scaled contents of the logs carried.

With relation to this feature of the case the department's findings stated:

"In Western Washington logs are largely produced and sold by loggers to manufacturers of lumber. The logger acquires standing timber which he cuts and transports either by rail or by water to the manufacturing point or to tidewater. The logs are sold for an amount in dollars and cents per one thousand feet, board measure. The footage is ascertained by applying Scribner Decimal 'C' rule, with deductions to fully cover all defects. In other words the vendor is paid only for the amount of merchantable lumber in the log reduced to inch boards. This is termed the commercial or selling scale.

"There is no question but that in the earlier years little or no effort was made by the carriers to definitely determine the actual scale of the logs they carried. They were then getting outbound lumber tonnage greatly in excess of the product from the logs they hauled in. The largest proportion of the total cut of all sawmills was then shipped by rail. The carriers had never up to that time published or filed with the Department rules or regulations covering the scaling of logs and it is apparent that there was a wide variance in scaling methods, not only as between the several carriers but even between different log movements on the same road. The tendency during that period was to accept shippers' log scales or to assess charges on basis of the commercial scale or on the nominal minimum scale.

"With the restoration of intercoastal traffic through the Panama Canal after the war, more and more lumber and other forest products moved to the eastern coast of the United States by water and less overland, particularly to destinations in the far eastern states. Apparently the carriers realized that their volume of outbound long haul lumber was bound to decrease by reason of this Panama Canal competition and they determined to scale the inbound log shipments more rigidly with a view to increasing revenue from that source. Complaints to us of overscaling began to multiply and early in 1927 the Department entered a complaint upon its own motion alleging that the joint log schedule (Henry Tariff No. 51, supra) contained no rules or regulations defining the method of scaling logs; that prior to the filing of that schedule it was the universal practice of the carriers to scale logs upon the board measure content as determined by application of the Scribner Decimal 'C' rule with appropriate deductions for defects. Meanwhile many of the log shippers filed with the Department

reparation claims covering differences ranging up to 30 per cent in the charges on logs scaled on the board measure or commercial scale and the charges of the carriers based upon their scale. One of these complaints was heard by the Department (Cause No. 6012, Sauk River Lumber Company v. N. P.) and reparation was awarded to the commercial scale. The Department's order was reviewed by the N. P. and was affirmed by the State Supreme Court (160 Wash. 691, 295 P. 926).

"There are now pending before the Department thirty-six additional reparation claims covering alleged over scaling totaling $644,144.99, upon which hearings have not yet been had.

"On September 1, 1927, the respondents through their publishing agent S. J. Henry, filed with the Department a schedule (Tariff No. 54) providing rules for the measurement of saw logs. The schedule carried upon its face a symbol indicating a reduction of rates. Upon complaint of certain shippers alleging that it substantially increased the charges the Department suspended this schedule. At the hearing counsel for two of the respondent carriers admitted that the application of the schedule would result in an increase of the charges. Whereupon the Department finding that the schedule was misleading and therefore unlawful ordered it cancelled. (Cause 6075). The carriers reviewed the Department's order and upon appeal to the state Supreme Court the Department's order was affirmed. (156 Wash. 137, 286 P. 86).

"On May 9, 1930, respondents filed the schedule which precipitated the instant proceedings. (Henry Tariff No. 51–B, supra.) This schedule incorporates the scaling rules first promulgated in Tariff No. 54 supra with some differences as to deductions for defects and also provides rates 10 per cent. higher than the rates now in effect. * * *

"The log traffic is practically all short-haul movement. The average haul was 33.7 miles in November, 1927, compared with 113.5 miles for all intrastate traffic in Washington. Terminal expense of log traffic is the same regardless of length of haul, but on short-haul traffic, terminal expense must be prorated over a lesser mileage, making the per mile cost higher. As it is necessary to pay train and engine crews a minimum of 100 miles per day even though the actual mileage made is less, the cost is greater than on traffic carried a longer distance. It is necessary to furnish special equipment for log service, such as patent bunk cars, 'skeleton' log flats, etc. The log equipment of the re-

spondents is permitted to go to the loading points on private logging roads which for the most part are constructed for temporary operation in rugged territory with heavy grades, severe curvature and close clearances. Considerable damage is experienced by broken sills and decking, and to steps, grab irons, brake wheels, flat wheels, etc. Some of these damages are charged to the loggers, it being the custom to have a joint car inspector at the junction point. Higher maintenance charges on branch lines are required where log transportation is involved, as it is necessary to use heavier rail and more ballast where the log movement is heavy. There is an excessive empty return haul stated as three times that of other traffic on the two divisions. The handling of logs is more hazardous than other freight and it has been found necessary to operate trains which contain logs on a slower than average schedule. This is due to the higher center of gravity, unstable character under side roll, uneven distribution of load on account of variation in size of logs and the damage which results from logs rolling off while train is in motion. Logs frequently roll off cars in transit and it is necessary about once a year for respondents at their expense to furnish an engine, train crew, derrick and derrick crew to pick them up along the right of way over which logs are carried between points of origin and destination. There is more or less irregularity of movement due to moving of logging operations from one point to another, breakdown of machinery, etc. These intermissions are usually of three or four days duration; no advance notice is usually received, and since the operations are largely on isolated branch lines away from important terminals, train and engine crews must be assigned to such log service with a temporary lay-over point and must under working agreement be paid unless or until they are returned to their home terminal. While the record shows that private logging railroads and small common carriers roads are able to transport logs with lesser expense than respondents, it also shows that respondents are bound by the Federal Labor Act, Full-crew Law, and working contracts and agreements with their employees which cannot be deviated from, but which are not in force on the short lines and logging roads referred to. Rates of pay and working conditions are fixed and, obviously, cannot be changed during the life of the existing agreements. (U. S. Code Sup. II, title 45, sec. 151 to 163, incl., 44 Stat. L. 577.) * * *

"It is of course true, as pointed out by the Loggers, that none of these commodities" —(common brick, sand and gravel, grain, lumber, coal [both lump and slack], junk, cement, and fuel wood)—"move in train loads in Western Washington, nor in a volume comparable with logs. It is also true, as pointed out by the carriers, that these other commodities do not require special equipment nor is the movement as spasmodic as the log traffic. * * *

"That there may be no confusion as to our findings it might be explained that the record contains much reference to 'scale rule' and 'scaling rules.'

"The terms as used have two different meanings. The 'scale rule' is a measuring stick usually 60 inches or more in length with printed numerals on the four sides. This rule is used by the scaler to ascertain the diameter of the log, thereby arriving at the gross scale (Exhibit 72). Where reference is made to 'scaling rule or rules' in other parts of the record it covers the rules of the Bureau or of respondents in their schedule as to how logs shall be measured and as to deductions that shall be made from the full or gross scale to cover defects, etc.

"As heretofore stated the suspended schedule provides that Scribner Decimal 'C' rule shall be applied to determine the number of feet as shown in a table of measurements incorporated in the schedule. Diameter of the log is to be taken at the small end, inside the bark. Measurement is to be in even number of feet. All logs 42 feet to 80 feet in length are to be scaled as two logs by dividing the length in even feet and measuring the diameter at the small end to obtain measurement of the first log; the diameter of the second log to be arrived at by adding one inch to the actual diameter for each ten lineal feet in the first log. Longer logs are to be divided into three lengths and scaled in similar manner. The only deduction for defects is for hollow logs which are to be measured by deducting one-half of the length of the hollow. It is the failure to make full deduction for other defects that constitutes the difference between the railroad scale and the commercial scale.

"Respondents say that this scaling method has been in effect since January 1, 1930, when the scaling of all logs was placed in the hands of a railroad scaling bureau in charge of S. J. Henry, Agent, North Pacific Coast Freight Bureau. Prior to that date logs were scaled by scalers of the individual carriers and deductions were then provided also for sap rotten logs.

"A large proportion of logs produced in Western Washington is more or less defective. These defects consist of conk rot, hollow butt, wind shake, pitch rings, sap rot, stump rot, etc. To bring about uniformity of practice and to determine a definite basis of settlement between the loggers and the saw mills to which logs are sold, the Puget Sound Log Scaling & Grading Bureau, hereinafter referred to as the Bureau, was organized in 1913. It is operated by the principal loggers in the Puget Sound District. It is estimated that the Bureau scales 80 per cent. of all logs marketed on Puget Sound. In employing scalers the Bureau requires them to be highly skilled. They must first serve an apprenticeship of several years as tallymen. They must also be familiar with the practice of sawmills as it relates to the sawing of logs and the amount of merchantable timber in defective logs of various kinds. In instances where defects are more or less concealed they must use judgment in estimating the proportion of merchantable lumber. Such ability can only be acquired by experience both in scaling and in studying the actual sawing operation of defective logs. No such skill is required on the part of respondents' scalers because aside from the arithmetical exercise of computing the measurements it is only necessary for them to estimate one-half of the actual hollow part of logs having that defect. Respondents' scalers scale the logs on cars at destination immediately prior to unloading. For the most part the bureau scalers scale the logs after they are dumped into the water and placed in rafts.

"The record shows that since 1925 the differences between the railroad scale and the bureau scale has varied on different selected movements from 3 per cent. to 17.8 per cent. For example, on a movement of the same class and quality of logs from Darrington to Everett via the N. P., the variations were as follows:

|  | Feet | Per Cent. |
|---|---|---|
| Oct. 1, 1925, to Dec. 31, 1925........... | 20,039,600 | 17.8 |
| Jan. 1, 1927, to June 30, 1927......... | 33,409,950 | 15.7 |
| Year 1928 ............................. | 75,217,520 | 3.0 |
| Year 1929 ............................. | 62,525,940 | 13.6 |
| Jan. 1, 1930, to June 30, 1930......... | 28,256,820 | 15.1 |

"On a movement via the Milwaukee from Reliance to Tacoma, May 1, 1926, to July 1, 1927, 113,189,329 feet, the per centage of railroad scale above commercial scale was 16.9; while on a movement over the same line from Ashford to Tacoma, April 1, 1926, to May 1, 1927, 26,547,238 feet, it was but 4.9 per cent. Exhibits detailing the scale of individual cars show that in some cases the railroad scale which purports to be more nearly the full or gross scale was appreciably under the selling scale. In two instances these disparities in feet appear as follows:

| Car Number | R. R. Scale | Bureau Scale | Railroad Underscale |
|---|---|---|---|
| 64,104 | 7,980 | 10,360 | 2,380 |
| 121,511 | 6,780 | 9,810 | 3,030 |

"There has been a continual controversy between the respondents and the Loggers over scaling methods for over ten years. It is our opinion that this controversy is bound to be perennial so long as the present situation exists. While the loggers sell their product on basis of the merchantable content of the log and are compelled to pay transportation charges on a different and higher scale, they are bound to feel that they are being overcharged. So long as the scaling of logs by respondents is left to the discretion of an individual employee with no check upon him except the test scale rule provided in Item 62 of the suspended schedule, which appears to be rather arbitrary and probably unworkable, there is no hope of a satisfactory solution of the controversy. In fact, to give effect to the suspended schedule would unquestionably increase the friction since the scaling rules contained therein are even less liberal as to deductions than those employed by at least some of the respondents when their individual scalers were employed.

"The fundamental objection to assessing rates by scale is the lack of scientific accuracy. Too much depends on the judgment of the scaler, particularly when the scaling is done on the cars and careful measurement is prevented by operating conditions.

"It is common knowledge that logs are shipped in varying lengths up to 40 feet. When logs of different lengths are loaded on the same car it is obvious that respondents' scalers could not accurately measure on the car a short log loaded underneath logs of longer lengths. He could not get his scale rule near enough to measure either the diameter or length. His results would necessarily have to be based upon a rough estimate.

"This is particularly true in view of the methods employed by respondents at the more important tidewater points where the terminal switching and dumping are handled by switch crews. In many instances and particularly where tide conditions demand immediate dumping of the logs into the water, the switch engine is coupled on to log trains immediately upon arrival. While the scaling operation is being conducted the switch engine and crew are standing by. Naturally the scaler makes every effort to expedite his part

of the work. He is urged to make haste to minimize delay to the engine and crew and under those conditions the limited time he is allowed renders it utterly impossible for him to reach accurate conclusions.

"Members of this Department were engaged in the lumber industry for many years and know from their own experiences that an accurate scale of logs on cars is impossible under present methods. The scaling rule proposed by respondents requires considerable skill and judgment of the scaler and the rule followed by the Bureau a great deal more. Either rule lacks that prerequisite of a scientific formula—it will not give the same results when applied by different men. No method should be employed which makes it necessary for an expert to determine the measure of the transportation charge.

"The Department sees no reason for allowing this condition to continue longer. On all other traffic, rates are assessed either on a weight basis or on a per car basis. Rates based on weight are inadvisable for logs in Western Washington, as the cheaper hemlock is heavier than cedar or fir. Moreover, such rates would force the railroads to provide track scales for each log movement and bear the expense of weighing. Rates on a per car basis obviate this objection. They would also eliminate the continued conflict over the correctness of the scaling, and would relieve the carriers of that cost, shown by the record to be 30 cents per car. Under the existing practice the footage of each car must be separately extended and the charges computed, because no two cars are likely to contain the same footage, therefore each individual carload shipment must be carried through the accounts as a separate transaction involving a considerable amount of clerical work and auditing. Converting the rates from thousand foot units to a 'per car' basis will simplify the work of accounting. It will enable respondents to waybill and expense all shipments made on the same day from the same shipping point, by one shipper to one consignee to the same destination on one bill with greatly simplified computations.

"There is always the possibility of shippers located at points where there are no track scales, overloading equipment if the lading consists of heavy material. Shippers quickly learn to limit their loads to the physical carrying capacity of the equipment furnished. There is no reason to assume that log shippers would be less careful and respondents have rules in force which will quickly cure the difficulty if it should appear. There should be no greater difficulty in policing overload-ing of equipment on the 'per car' basis than under present rates. The testimony shows that loaded cars are always inspected by respondents before being accepted and moved. It may be safely assumed that the 'per car' plan will tend to bring about greater uniformity in the loading of cars than the record shows has prevailed in the past.

"It will also result in a considerable saving to respondents in terminal expense since there is now a delay in the terminal delivery of logs while the switch crew is waiting for the scaler to complete the scaling operation which will be eliminated under the proposed plan.

"Application of the scaling rules as contemplated in Tariff 51–B would result in many saw logs that contain varying amounts of merchantable lumber being left in the woods, being wasteful and adding to the fire hazard. This is contrary to good public policy and against all recognized conservation plans.

"In view of our conclusions, it will not be helpful to discuss further the relative merits or demerits of the two methods of scaling, nor to comment on the overrun of manufactured product compared with the selling scale of logs, nor to discuss the contention of the loggers that the carriers have been overscaling. * * * "

In view of the foregoing, the department's action in making the change in rate from that based on the scaled measurement of the logs to one based on carloads was arbitrary. That this is so, is shown by the reasons advanced and arguments used to support it. It is only necessary to note and compare the following of these:

The department states: "The fundamental objection to assessing rates by scale is the lack of scientific accuracy. Too much depends on the judgment of the scaler, particularly when the scaling is done on the cars and careful measurement is prevented by operating conditions."

And again:

"No method should be employed which makes it necessary for an expert to determine the measure of the transportation charge. * * *

"There is always the possibility of shippers located at points where there are no track scales, overloading equipment if the lading consists of heavy material. Shippers quickly learn to limit their loads to the physical carrying capacity of the equipment furnished. * * *

"There should be no greater difficulty in policing overloading. of equipment on the 'per car' basis than under present rates. The testimony shows that loaded cars are always inspected by respondents before being accepted and moved. * * *

"Application of the scaling rules as contemplated in Tariff 51–B would result in many saw logs that contain varying amounts of merchantable lumber being left in the woods, being wasteful and adding to the fire hazard. This is contrary to good public policy and against all recognized conservation plans."

There remains for consideration the department's conclusion that the distance rates of plaintiffs' filed tariffs were improperly constructed, particularly in the lower steps. The findings recite:

"The log traffic is practically all short-haul movement. The average haul was 33.7 miles in November, 1927, compared with 113.5 miles for all intrastate traffic in Washington. Terminal expense of log traffic is the same regardless of length of haul, but on short-haul traffic, terminal expense must be pro-rated over a lesser mileage, making the per mile cost higher. As it is necessary to pay train and engine crews a minimum of 100 miles per day even though the actual mileage made is less, the cost is greater than on traffic carried a longer distance. It is necessary to furnish special equipment for log service, such as patent bunk cars, 'skeleton' log flats, etc. The log equipment of the respondents is permitted to go to the loading points on private logging roads which for the most part are constructed for temporary operation in rugged territory with heavy grades, severe curvature and close clearances. Considerable damage is experienced by broken sills and decking, and to steps, grab irons, brake wheels, flat wheels, etc. Some of these damages are charged to the loggers, it being the custom to have a joint car inspector at the junction point. Higher maintenance charges on branch lines are required where log transportation is involved, as it is necessary to use heavier rail and more ballast where the log movement is heavy. There is an excessive empty return haul stated as three times that of other traffic on the two divisions. The handling of logs is more hazardous than other freight and it has been found necessary to operate trains which contain logs on a slower than average schedule. This is due to the higher center of gravity, unstable character under side roll, uneven distribution of load on account of variation in size of logs and the damage which results from logs rolling off while train is in motion. Logs frequently roll off cars in transit and it is necessary about once a year for respondents at their expense to furnish an engine, train crew, derrick and derrick crew to pick them up along the right of way over which logs are carried between points of origin and destination. There is more or less irregularity of movement due to moving of logging operations from one point to another, breakdown of machinery, etc. These intermissions are usually of three or four days duration; no advance notice is usually received, and since the operations are largely on isolated branch lines away from important terminals, train and engine crews must be assigned to such log service with a temporary lay-over point and must under working agreement be paid unless or until they are returned to their home terminal. While the record shows that private logging railroads and small common carrier roads are able to transport logs with lesser expense than respondents, it also shows that respondents are bound by the Federal Labor Act, Full-crew Law, and working contracts and agreements with their employees which cannot be deviated from, but which are not in force on the short lines and logging roads referred to. Rates of pay and working conditions are fixed and, obviously, cannot be changed during the life of the existing agreements. (U. S. Code Sup. II, Title 45, Sec. 151 to 163, incl., 44 Stat. L. 577.) * * *

"The Department is of the opinion and finds that the distance rates and scaling rules named in Tariff No. 51–B are unjust and unreasonable and more than the traffic can bear. The Department is of the further opinion that the said distance rates are improperly constructed, particularly in the lower steps. For example, the difference in the mileage rate between the first two stops is 22 cents; between the second and third stop the difference is 16 cents; and thereafter the scale increases 8 or 9 cents for each five miles up to one hundred miles. The Department can see no justification for this disproportionate variation. The record and particularly Mr. Peterson's exhibit, shows that the greater portion of the costs of the log traffic would not be materially affected by a difference of five miles in the haul. Obviously, such major items as switching costs, trainmen's wages and interest charges would not ordinarily be so affected."

In the foregoing matter the department was, in reality, considering the question of whether there was a discrimination in the proposed rates favoring the short haul

(twenty miles and less) at the expense of the longer haul.

The finding by the department as to the extent of the discrimination is invalid because of the controlling consideration given the plight of the logging industry and the failure of the department to determine the rate base, revenue received from, and expense chargeable to log carriage.

The decree will be in plaintiffs' favor, without prejudice to recovery by shippers on account of the discrimination, if any.

Any findings, conclusions, or decree embodying the foregoing decision will be settled upon notice, and hearing upon proposed findings, conclusions, and decree to be had, in the first instance, before Judge Cushman for submission, with a recommendation, to the other members of the court.

The clerk is directed to notify the attorneys who have appeared herein for the parties of this decision.